HOFFSTADT, J.
*806 While watching his six-month-old daughter by himself one evening, a man struck her so hard that he killed her. He confessed to doing so while meeting privately with the child's mother in a police interview room, and the trial court admitted the confession at trial. That meeting, however, was orchestrated by police and occurred just hours after defendant had been questioned by police, had proffered an innocent explanation for the infant's death, and had thereafter repeatedly asked for a lawyer. This appeal presents three questions bearing on the admissibility of confessions in *341 criminal cases: (1) Does a suspect's invocation of his right to counsel under Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 ( Miranda ) preclude the admission of a confession a suspect subsequently makes to a person he is unaware is functioning as an agent of law enforcement, (2) Does continued questioning of a suspect after invocation of the Miranda right to counsel automatically taint any subsequent confession, and (3) Does the above described law enforcement conduct otherwise violate due process? We conclude that the answer to all three questions is "no," and affirm the trial court's ruling admitting his confession.
FACTS AND PROCEDURAL BACKGROUND
I. Facts
A. Underlying crime
Mia was a little over six months old at the time of her death. Mia died from blunt trauma. She had 29 bruises, seven rib fractures, a punctured right lung, bruised lungs, and a lacerated liver. Most of these injuries had been inflicted in the hours prior to Mia's death, as a pediatrician's appointment earlier the same day revealed only a few bruises and no internal bleeding.
Just hours before her death, however, Mia was playing with toys and "look[ing] fine." That was how her mother Nathaly Martinez (Martinez) last *807 saw Mia, when she left the infant in the sole custody of her boyfriend and Mia's father, Edward Orozco (defendant).
A few hours later, defendant called Martinez to report that Mia was not breathing. Martinez rushed back home, but Mia's body was cold to the touch and attempts at CPR by defendant, Martinez, and Martinez's relative did not resuscitate her. Administering CPR did not inflict any of Mia's injuries.
Someone called 911, and emergency medical personnel responded. A paramedic had to carry Mia out of the home while defendant, Martinez and other family members quarreled among themselves.
Attempts to revive Mia failed.
B. Subsequent interviews
1. Law enforcement interrogates defendant (the first interview)
A little before dawn the day after Mia's death, defendant voluntarily accompanied police to the police station. He met with three officers in an interview room, and they told him he was "not in custody" and was "free to leave." One of the officers nevertheless read defendant his Miranda rights, and defendant indicated that he understood them.
Defendant then proffered his account of what happened. He said he gave Mia some baby Motrin when she was crying; that he put her in her crib; and that when he came back upstairs a few hours later to check on her, her face was up against the side of the crib and she was no longer breathing. Defendant had no explanation for how Mia got so bruised up.
The interviewing officers expressed some skepticism, pointing out that defendant was "the last one with her" and pressing for an explanation of the numerous bruises on her body. However, defendant stuck to his account of what happened and said he "would never hurt [his] daughter."
An officer then asked if defendant would be "willing to sit down and repeat the story on a polygraph machine." Defendant responded by asking, "Can I have an attorney?" The officer responded, "Sure you can have an attorney," but that officer and *342 another officer then proceeded to ask defendant at least four times, "Why would you need an attorney"? In the midst of these further questions, defendant requested an attorney four more times, all the while maintaining that his account was truthful and that he had no explanation for Mia's injuries. *808 At that point, one of the officers placed defendant under arrest for Mia's murder. Another officer told defendant, "[Y]ou ask[ ] for your attorney ... but we're asking for your honesty." The officer then told defendant, "[i]f you're willing to talk to us right now" "[w]ithout your attorney present" "and [to] explain what happened[,] I'm not going to take you to jail." Defendant repeated his request for an attorney and the officer said, "All right. Go to jail. Done."
At that point, the interview ended. Defendant had not made any incriminating statements.
2. The conversation between defendant and Martinez
a. Pre-conversation
Several hours after the first interview, the police allowed defendant and Martinez to meet in an interview room at the police station. It is not clear who suggested the meeting. Before placing Martinez in the interview room, one of the police officers told her that maybe "you can get the full explanation out of [defendant]." The officer reminded her, "You are the mother of Mia and that you ha[ve] a right to know, that you ha[ve] to know, and that you ha[ve] to know everything." The officer did not give Martinez specific questions to ask or describe the particular information to get from defendant, but Martinez felt like she had to report back to the police.
b. First portion of conversation
The officer escorted Martinez into the interview room and immediately left, leaving Martinez alone with defendant. Their conversation was recorded.
Martinez asked defendant what happened while he was watching Mia. Defendant gave Martinez the same explanation he had previously given the police. Defendant said he was "scared," but Martinez assured him that "[she] knew" he "didn't do anything."
c. Interruption regarding autopsy and subsequent discussion
One of the officers then entered the interview room. He said he had received a call from the coroner's office. The autopsy, he reported, showed that Mia had "died at the hands of [an]other," that Mia "didn't suffocate," and *809 that her bruises were caused by "a beating." The officer then told defendant, "[Y]ou were the last one with your daughter and there's [no] doubt [about] it. She suffered major injuries. This may be the last time you guys get to talk to each other in person, okay?" He stated that "right now both of you are looking at going to jail for child neglect; causing the death of that baby." He then asked, "Did either of you have anything you want to say to me?" Martinez said, "No"; defendant was silent.
The officer left the interview room.
Martinez again asked defendant, "What happened?" Defendant said he "want[ed] [the police] to leave [her] alone" and that he did not want "them to take" Martinez. Martinez again reassured him, "We're ... going to get through this."
d. Officer momentarily pulls Martinez out of the room
The same officer who announced the autopsy results re-entered the room and *343 asked Martinez to step outside. He asked if she would take a polygraph test, and informed her that defendant had refused to do so. The officer then escorted Martinez back to the interview room. The officer later admitted that his purpose in doing this was to "stimulate conversation" between Martinez and defendant.
e. Resumption of conversation and confession
Once they were alone again, Martinez asked defendant, "[W]hy don't [you] want to take [the] polygraph?" Martinez reminded defendant that she was "Mia's mother," that she "need[ed] to know what happened to her," and that, "If you love me, you need to tell me the truth."
Defendant at first replied that he "didn't do it," but moments later said he "did it." While sobbing, he went on to confess that he "hit her" "once" and that he "fucking killed Mia," their "little baby."
A few minutes later, the officer returned, said "Time's up," and escorted Martinez from the interview room.
*810 II. Procedural Background
A. Charges
The People charged defendant with (1) murder ( Pen. Code, § 187, subd. (a) ),[1] and (2) assault on a child causing death (§ 273ab, subd. (a) ).[2]
B. Cross motions to suppress and admit
Defendant filed a written motion to exclude his confession as obtained in violation of Miranda . The People filed a cross-motion to admit the confession.
The trial court ruled that the confession was admissible. The court found that Martinez was an agent of the police at the time she spoke with defendant in the interview room, but ruled that "the case law"-specifically, Illinois v. Perkins (1990) 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 ( Perkins ), People v. Guilmette (1991) 1 Cal.App.4th 1534, 2 Cal.Rptr.2d 750 ( Guilmette ) and People v. Plyler (1993) 18 Cal.App.4th 535, 22 Cal.Rptr.2d 772 ( Plyler )-foreclosed defendant's argument that his prior invocation of his Miranda right to counsel mandated suppression because defendant had been unaware of Martinez's role as a police agent and thought he was talking to his girlfriend. The court also rejected defendant's argument that officer's intervention to announce the autopsy results changed the analysis because the officer "just came in and then he left again."
C. Verdicts, sentencing and appeal
The matter proceeded to a jury trial. The jury convicted defendant of second degree murder and assault on a child causing death.
The trial court sentenced defendant to prison for 25 years to life on the assault count. The court imposed, but stayed under section 654, a sentence of 15 years to life on the murder count. The court also imposed $60 in court operations assessments, $80 in criminal conviction assessments, and the minimum $300 restitution fine, and imposed but suspended a $300 parole revocation fine.
Defendant filed a timely notice of appeal.
*811 DISCUSSION
Defendant argues that the trial court erred in not suppressing his confession *344 to Martinez under (1) Miranda and (2) due process.** We independently review the trial court's legal determinations on these issues but review its underlying factual findings for substantial evidence. ( People v. Williams (2010) 49 Cal.4th 405, 425, 111 Cal.Rptr.3d 589, 233 P.3d 1000 [ Miranda determination]; People v. Carrington (2009) 47 Cal.4th 145, 169, 97 Cal.Rptr.3d 117, 211 P.3d 617 [due process determination]; People v. Tate (2010) 49 Cal.4th 635, 686, 112 Cal.Rptr.3d 156, 234 P.3d 428 [factual findings].)
I. Miranda
Miranda established the now-familiar rule that prosecutors may not admit a suspect's statements in their case-in-chief against the suspect-defendant unless (1) the defendant was advised that (a) "he has a right to remain silent," (b) anything he says "may be used as evidence against him," (c) "he has the right to the presence of an attorney," and (d) the defendant will be provided an attorney if he cannot afford one; (2) the defendant waived those rights, either expressly (by affirmatively indicating a waiver) or implicitly (by answering questions); and (3) prior to making the statements to be admitted, the defendant did not invoke either his right to remain silent or his Miranda right to an attorney. ( Miranda , supra , 384 U.S. at pp. 444-445, 473-474, 476, 86 S.Ct. 1602 ; People v. Sauceda-Contreras (2012) 55 Cal.4th 203, 218-219, 145 Cal.Rptr.3d 271, 282 P.3d 279.)
Critically, however, Miranda 's rule has a limit: It only applies when the suspect-defendant was the subject of "custodial interrogation." ( Miranda , supra , 384 U.S. at p. 444, 86 S.Ct. 1602.) This limitation is a function of Miranda 's underlying rationale-namely, as a "constitutional rule" implementing the Fifth Amendment's privilege against self-incrimination. ( Dickerson v. U.S. (2000) 530 U.S. 428, 440-444, 120 S.Ct. 2326, 147 L.Ed.2d 405 ( Dickerson ).) The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." ( U.S. Const., 5th amend., italics added.) Miranda was the first case to acknowledge that "in-custody interrogation of persons suspected or accused of crime contains *812 inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so." ( Miranda , at p. 467, 86 S.Ct. 1602.) Although the "informal," "psychological" pressures inherent in "incommunicado interrogation" do not themselves render a statement involuntary ( id. at pp. 445, 449, 461, 120 S.Ct. 2326 ; Dickerson , at p. 444, 120 S.Ct. 2326 ), Miranda reasoned that those pressures nonetheless necessitate a "protective device"-namely, Miranda 's rule-to ensure that suspects do not make the type of compelled statements at the core of the Fifth Amendment's privilege ( Miranda , at pp. 458, 465, 86 S.Ct. 1602 ).
Defendant asserts that his confession to Martinez should have been suppressed for two independent reasons: (1) he invoked his Miranda right to counsel during the first interview and the police officers violated Miranda by subsequently sending Martinez to speak with him, and (2) the officers violated Miranda during the first interview, and that his subsequent confession to Martinez was the "tainted fruit" of that earlier violation.
A. Does defendant's prior invocation of his Miranda right to counsel require suppression of his statements to Martinez?
Defendant argues that his repeated invocation of his Miranda right to counsel *345 during the first interview precluded the court from admitting the confession obtained during his subsequent, arranged meeting with Martinez. For support, he cites Edwards v. Arizona (1981) 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 ( Edwards ), which holds that a suspect's invocation of his Miranda right to counsel precludes "further police-initiated custodial interrogation" unless and until counsel is present or the suspect "initiates further communication" with the police. ( Id. at pp. 484-485, 101 S.Ct. 1880.) The People respond that defendant's confession to Martinez does not run afoul of Miranda because (1) Martinez was not an agent of the police, and (2) defendant did not know Martinez was working with the police. For support of their second argument, the People cite Perkins , supra , 496 U.S. 292, 110 S.Ct. 2394, which holds that " Miranda warnings are not required when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement." ( Id. at p. 294, 110 S.Ct. 2394 ; accord People v. Williams (1988) 44 Cal.3d 1127, 1141-1142, 245 Cal.Rptr. 635, 751 P.2d 901 [same].) Substantial evidence supports the trial court's findings that Martinez was an agent of the police when she met with defendant (because the officers implored her to "get an explanation" from defendant) and that defendant did not know Martinez was such an agent (because there is no evidence defendant knew of any of the conversations between Martinez and the officers). Accordingly, this case squarely presents the question: When a suspect invokes his Miranda right to counsel and law enforcement subsequently orchestrates a conversation between the suspect and someone the suspect does not know is an agent of law enforcement, which decision controls- Edwards or Perkins ? *813 We conclude that Perkins controls, and we do so for three reasons.
First, the language in Edwards itself dictates that Edwards is inapplicable. Edwards fleshed out what Miranda meant when it said that "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." ( Miranda , supra , 384 U.S. at p. 474, 86 S.Ct. 1602.) Specifically, Edwards held that a suspect who has invoked his Miranda right to counsel may not be "subject[ed] to further interrogation by the authorities" on any crime at all unless (1) counsel is present "at the time of [any further] questioning," or (2) the suspect "himself initiates further communication, exchanges or conversations with the police." ( Edwards , supra , 451 U.S. at pp. 484-485, 101 S.Ct. 1880, italics added; Arizona v. Roberson (1988) 486 U.S. 675, 677, 108 S.Ct. 2093, 100 L.Ed.2d 704 ( Roberson ); Minnick v. Mississippi (1990) 498 U.S. 146, 147, 153, 111 S.Ct. 486, 112 L.Ed.2d 489 (Minnick ).) By their terms, Edwards and its progeny have applied these restrictions only to further "interrogation" of the suspect. ( Edwards , at pp. 478, 482, 484-486, 101 S.Ct. 1880 ; Roberson , at pp. 677, 680, 687, 108 S.Ct. 2093 ; Minnick , at p. 157, 111 S.Ct. 486.) Indeed, Edwards specifically noted "[a]bsent ... interrogation , there would be no infringement of the [ Miranda ] right [to counsel] that Edwards invoked." ( Id. at p. 486, 101 S.Ct. 1880, italics added; cf. id. at p. 485, 101 S.Ct. 1880 ["nothing ... would prohibit the police from merely listening to [a suspect's] voluntary, volunteered statements and using them against him at the trial."].)
For purposes of Miranda , "interrogation" means "express questioning" or "words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response." ( *346 Rhode Island v. Innis (1980) 446 U.S. 291, 300-301, 100 S.Ct. 1682, 64 L.Ed.2d 297 ( Innis ).) Because interrogation "reflect[s] a measure of compulsion above and beyond that inherent in custody itself" ( id. at p. 300, 100 S.Ct. 1682 ), not all statements a defendant makes while in custody are "the product of interrogation" ( id. at p. 299, 100 S.Ct. 1682 ). Whether the police action is "reasonably likely to elicit an incriminating response" is judged by what the suspect perceives, not what the police intend. ( Id. at p. 301, 100 S.Ct. 1682.) Implicit in the definition of "interrogation" is that (1) the suspect is talking to the police or an agent of the police, and (2) the suspect is aware that he is talking to the police or one of their agents. This is why a suspect can be subject to "interrogation" when he knowingly interacts with the police or their agents. ( Id. at p. 295, 100 S.Ct. 1682 [speaking with police]; In re I.F. (2018) 20 Cal.App.5th 735, 773, 229 Cal.Rptr.3d 462 [same]; In Interest of D.W. (1982) 108 Ill. App. 3d 1109, 1110-1111, 64 Ill.Dec. 588, 440 N.E.2d 140 [same]; People v. Ghent (1987) 43 Cal.3d 739, 750-751, 239 Cal.Rptr. 82, 739 P.2d 1250 [speaking with psychiatrist retrained by the police]; People v. Sanchez (1983) 148 Cal.App.3d 62, 69-70, 195 Cal.Rptr. 558 [speaking with doctor working with police in presence of police]; see also Estelle v. Smith (1981) 451 U.S. 454, 467-468, 101 S.Ct. 1866, 68 L.Ed.2d 359 [speaking with prison psychiatrist pursuant to court order].) *814 Conversely, there is no "interrogation" when a suspect speaks with someone he does not know is an agent of the police. ( Arizona v. Mauro (1987) 481 U.S. 520, 521, 526-529, 107 S.Ct. 1931, 95 L.Ed.2d 458 [spouse]; People v. Tate (2010) 49 Cal.4th 635, 685-686, 112 Cal.Rptr.3d 156, 234 P.3d 428 [possible accomplice/accessory]; People v. Mayfield (1997) 14 Cal.4th 668, 758, 60 Cal.Rptr.2d 1, 928 P.2d 485 [father]; People v. Leonard (2007) 40 Cal.4th 1370, 1398-1402, 58 Cal.Rptr.3d 368, 157 P.3d 973 [father]; People v. Webb (1993) 6 Cal.4th 494, 526, 24 Cal.Rptr.2d 779, 862 P.2d 779 ["friend and lover"]; People v. Thornton (2007) 41 Cal.4th 391, 429-430, 432, 61 Cal.Rptr.3d 461, 161 P.3d 3 [grandmother]; People v. Jefferson (2008) 158 Cal.App.4th 830, 840-841, 70 Cal.Rptr.3d 451 ["friend[ ]" and "neighbor[ ]"].) Because there is no "interrogation" in these circumstances, there is also no basis to apply Edwards's restrictions on further "interrogation."
Second, the rationale underlying Miranda dictates that Perkins , not Edwards , should control. As described above, Miranda 's rule requiring a warning, a waiver and the cessation of questioning if a suspect invokes his Miranda rights is designed to dispel the "compelling" "psychological" "pressures" that are part and parcel of "in-custody interrogation." ( Miranda , supra , 384 U.S. at pp. 448-449, 461, 467, 86 S.Ct. 1602.) Edwards's rule is based on those same pressures: A suspect's invocation of his Miranda right to counsel means "he is not capable of undergoing such questioning without advice of counsel," and "any subsequent waiver [by the suspect of his Miranda rights] ... has come at the authorities' behest, and not at the suspect's own instigation. [Citation.]" ( Roberson , supra , 486 U.S. at p. 681, 108 S.Ct. 2093.) Edwards's rule is accordingly "justified only in circumstances where th[ose] coercive pressures" exist. ( Maryland v. Shatzer (2010) 559 U.S. 98, 115-116, 130 S.Ct. 1213, 175 L.Ed.2d 1045 ( Shatzer ).) This makes sense: Edwards implements Miranda , so should be limited to the evil Miranda was created to combat.
Because "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated *347 person speaks freely to someone" that he thinks is a lover, a family member, a friend or even a fellow criminal ( Perkins , supra , 496 U.S. at p. 296, 110 S.Ct. 2394 ; People v. Terrell (2006) 141 Cal.App.4th 1371, 1386, 46 Cal.Rptr.3d 927 ["there can be no coercion for Miranda purposes when the defendant is subjectively unaware of any police involvement in eliciting or recording his statements"] ), Miranda 's (and, by extension, Edwards's ) purpose in combating that atmosphere and compulsion is simply not implicated in such situations. To apply Edwards here is to require police to provide counsel while a suspect is speaking with a lover, family member or friend in what he (mistakenly) thought was a private conversation. This would undoubtedly discourage suspects from speaking to anyone and thus effectively convert Edwards into a rule automatically *815 excluding all post-invocation statements, a result that Edwards itself acknowledged swept far beyond Miranda 's reach. ( Edwards , supra , 451 U.S. at p. 486, 101 S.Ct. 1880 ; see also Shatzer , supra , 559 U.S. at pp. 110-111, 130 S.Ct. 1213 [post-invocation statements made after sufficient break in custody may be admitted].)
Third, and not surprisingly, California courts have uniformly come to the conclusion that Perkins controls when a suspect invokes his Miranda right to counsel but later speaks with someone he does not know is an agent of the police. That was the holding of Guilmette , supra , 1 Cal.App.4th at pp. 1540-1541, 2 Cal.Rptr.2d 750, and Plyler , supra , 18 Cal.App.4th at pp. 544-545, 22 Cal.Rptr.2d 772.
Defendant resists this conclusion with what boil down to five categories of arguments.
First, defendant contends that Perkins should not control because Perkins did not involve a suspect who had previously invoked his Miranda right to counsel; Edwards , he urges, should control where there is such an invocation. For support, he cites two sources. He cites a footnote from Justice Brennan's concurrence in Perkins , where Justice Brennan opined that "[i]f [Perkins] had invoked either [his Miranda right to remain silent or his Miranda right to counsel], the inquiry would focus on whether he subsequently waived the particular right" and then proceeded to cite Edwards . ( Perkins , supra , 496 U.S. at p. 300, 110 S.Ct. 2394, fn. * (conc. opn. of Brennan, J.).) Perkins had a seven-Justice majority, however, so Brennan's concurrence was not the critical fifth vote; as a consequence, the concurrence is dicta. (E.g., Maryland v. Wilson (1997) 519 U.S. 408, 412-413, 117 S.Ct. 882, 137 L.Ed.2d 41.) Justice Brennan also makes no attempt to reconcile Edwards's limitation to post-invocation "interrogations" with his concession elsewhere in his concurrence that the "questioning" of Perkins in that case "does not amount to 'interrogation.' " ( Perkins , at p. 300, 110 S.Ct. 2394.) Defendant also cites the state appellate decision on remand from Perkins , where the court held that Perkins's conversation with the undercover agent constituted "interrogation." ( People v. Perkins (1993) 248 Ill. App. 3d 762, 771, 188 Ill.Dec. 705, 618 N.E.2d 1275.) Curiously, however, that decision nowhere addressed the Supreme Court's prior decision in Perkins and, as a result, is simply incorrect in holding that the conversation constituted "interrogation."
Second, defendant asserts that the law otherwise dictates that conversations between a suspect and people he does not know are agents of the police constitute "interrogation," such that Guilmette and Plyler were wrongly decided. For support, he again cites two sources. He cites Justice Marshall's dissent in Perkins , where he opines that "[t]he Court does not dispute *348 that the police officer here conducted a custodial interrogation of a criminal suspect." ( Perkins , supra , 496 U.S. at p. 304, 110 S.Ct. 2394 (dis. opn. of Marshall, J.).) Beyond the *816 obvious facts that what is said in a dissenting opinion is usually the opposite of the court's holding and is in any event dicta, Justice Marshall's characterization of the Perkins's majority decision is at odds with both the majority opinion itself and, as noted above, with Justice Brennan's concurrence. Defendant also cites language in a footnote in Patterson v. Illinois (1988) 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261, stating that "a surreptitious conversation between an undercover police officer and an unindicted suspect would not give rise to any Miranda violation as long as the 'interrogation' was not in a custodial setting." ( Id. at p. 296, fn. 9, 108 S.Ct. 2389.) Patterson made this statement in the context of distinguishing the protections afforded by Miranda from those afforded by the Sixth Amendment under Massiah v. U.S. (1964) 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. Patterson was not attempting to define the meaning of "interrogation" and, more importantly, Patterson came before Perkins . As the latter decided case that squarely addresses the issue, Perkins controls.
Third, defendant posits that even if Guilmette and Plyler are not wrongly decided, they are distinguishable. In each case, he points out, the suspect had been the one to initiate the post-invocation conversation that resulted in a confession. ( Guilmette , supra , 1 Cal.App.4th at p. 1538, 2 Cal.Rptr.2d 750 ; Plyler , supra , 18 Cal.App.4th at p. 541, 22 Cal.Rptr.2d 772.) In this case, the evidence is conflicting over whether defendant was the one to suggest speaking with Martinez. But even if we assume that the police orchestrated the conversation, what makes Edwards apply rather than Perkins is whether the suspect knew he was talking to a police agent, not who initiated that talk in the first place.
Fourth, defendant urges that even if his conversation with Martinez did not start out as an interrogation, it became one once the officer returned with a summary of the autopsy findings and asked if either parent had "anything [they] want[ed] to say." Had defendant answered the officer's question with an incriminating statement, he would have been interrogated. But he did not. Instead, defendant said nothing, and the officer left. At that point, defendant resumed his one-on-one conversation with Martinez, completely unaware she was an agent of the police. His subsequent confession to her was accordingly not the product of an interrogation.
Lastly, defendant argues that the police engaged in a "persistent, underhanded attempt ... to obtain a confession" by blatantly disregarding his repeated requests for counsel and then orchestrating a tearful confrontation with his girlfriend and the mother of his now-dead infant. The police conduct in this case was deplorable. (Accord, Missouri v. Seibert (2004) 542 U.S. 600, 616, 124 S.Ct. 2601, 159 L.Ed.2d 643 (plurality) [decrying "police strategy adapted to undermine the Miranda warnings"].) But the question we must *817 decide is whether it is unconstitutional .[4] Miranda *349 is not a free-floating bulwark against unfair police tactics. Constitutional rules are anchored to their rationales ( Shatzer , supra , 559 U.S. at p. 106, 130 S.Ct. 1213 ["A judicially crafted rule is 'justified only by reference to its prophylactic purpose ...' [Citation]"] ), and Miranda 's rule is moored to its purpose of "preventing government officials from using the coercive nature of confinement to extract confessions" ( Mauro , supra , 481 U.S. at pp. 529-530, 107 S.Ct. 1931 ; Oregon v. Elstad (1985) 470 U.S. 298, 304-305, 105 S.Ct. 1285, 84 L.Ed.2d 222 ( Elstad ) [ Miranda is designed to combat the "psychological pressures to confess emanating from ... official coercion"] ). " Miranda forbids coercion," the Supreme Court has said, "not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be" someone he can trust. ( Perkins , supra , 496 U.S. at p. 297, 110 S.Ct. 2394.) To construe Miranda to reach the non-coercive police conduct in this case is to untether Miranda from its purpose and, in so doing, undermine its legitimacy as one of the many bulwarks protecting the constitutional rights of criminal defendants. We decline to sully Miranda in this fashion.
B. Is defendant's confession to Martinez the tainted fruit of his first interview?
Defendant alternatively argues that, even if his confession to Martinez was not the product of an interrogation barred by Edwards , supra , 451 U.S. 477, 101 S.Ct. 1880, the confession must nevertheless be suppressed because it is the fruit of the first interview during which the police violated his Miranda rights by continuing to interrogate him despite his repeated invocation of his Miranda right to counsel. For support, defendant cites People v. Montano (1991) 226 Cal.App.3d 914, 277 Cal.Rptr. 327 ( Montano ).
When the police violate a suspect's Miranda rights, the statement immediately resulting from that violation is inadmissible in the prosecution's case-in-chief. ( Miranda , supra , 384 U.S. at pp. 444-445, 86 S.Ct. 1602.) That violation may also warrant suppression of subsequent statements obtained as a result of the initial violation. ( People v. Storm (2002) 28 Cal.4th 1007, 1027, 124 Cal.Rptr.2d 110, 52 P.3d 52.) However, because a violation of Miranda does not necessarily result in a confession that is "compelled"
*818 within the meaning of the Fifth Amendment ( Dickerson , supra , 530 U.S. at 444, 120 S.Ct. 2326 ; Elstad , supra , 470 U.S. at p. 310, 105 S.Ct. 1285 ), an initial Miranda violation does not "inherently taint[ ]"-and thus warrant suppression of-all subsequent statements ( Elstad, at p. 307, 105 S.Ct. 1285 ). Instead, a defendant seeking to suppress a statement as the tainted fruit of a Miranda violation must establish that any subsequent confession was involuntary. ( Storm, at pp. 1029-1030, 124 Cal.Rptr.2d 110, 52 P.3d 52 ; People v. Case (2018) 5 Cal.5th 1, 23-26, 233 Cal.Rptr.3d 439, 418 P.3d 360 ( Case ); People v. Bradford (1997) 14 Cal.4th 1005, 1039-1041, 60 Cal.Rptr.2d 225, 929 P.2d 544 ( Bradford ).) We adjudge whether a confession was voluntary by looking to the totality of the circumstances. ( Moran , supra , 475 U.S. at p. 421, 106 S.Ct. 1135.)
Applying these standards, defendant's confession to Martinez was not the suppressible fruit of an earlier Miranda violation. Significantly, the officers' initial Miranda violation in questioning defendant *350 despite his repeated request for counsel did not produce any confession. Instead, defendant steadfastly maintained his innocence. This is accordingly not a case where the initial Miranda violation produced a confession that, once made, put pressure on a suspect to reaffirm that prior confession; in this case, the proverbial "cat" never got out of the "bag." Further, and for the reasons outlined in detail above, defendant's statements to Martinez were voluntary because he (mistakenly) believed he was having a private conversation with his girlfriend; he had no idea that police were exerting any pressure on him at all.
Montano does not dictate a different result. Montano held that a police officer's repeated refusal to honor a suspect's invocation of his right to remain silent under Miranda by itself constituted "coercion" that automatically rendered any subsequent confession the tainted "fruit" of that earlier violation. ( Montano , supra , 226 Cal.App.3d at pp. 933-934, 277 Cal.Rptr. 327.) Our Supreme Court subsequently rejected Montano 's holding when it ruled that "continued interrogation after a defendant has invoked his" Miranda "right[s]" does not "inherently constitute coercion." ( Bradford , supra , 14 Cal.4th at p. 1039, 60 Cal.Rptr.2d 225, 929 P.2d 544 ; Storm , supra , 28 Cal.4th at pp. 1031-1033, 124 Cal.Rptr.2d 110, 52 P.3d 52.) Indeed, Storm went so far as to declare Montano to be "not" "persuasive" on this precise point. ( Storm , at p. 1037, fn. 13, 124 Cal.Rptr.2d 110, 52 P.3d 52.)
II. Due Process
Defendant argues that his confession should have been suppressed as obtained in violation of due process because the police officers (1) deliberately ignored his repeated requests for counsel during the first interview and thereafter sent Martinez in to "get the full explanation" from him; and (2) highlighted the seriousness of the crime, threatened to arrest him and put him in jail if he did not "explain what happened" and stated that he and Martinez were "looking at going to jail for child neglect." The People respond that *819 defendant cannot raise a due process-based objection now because he did not do so before the trial court.
A. Forfeiture
Defendant has forfeited any due process challenge to his confession. His motion to suppress was based solely on Miranda , and our Supreme Court has held that a Miranda -based objection to a confession is legally distinct from a due process-based objection; one objection does not preserve the other for appellate review. ( People v. Ray (1996) 13 Cal.4th 313, 339, 52 Cal.Rptr.2d 296, 914 P.2d 846.) However, because defendant responds that his counsel was constitutionally ineffective for not making a due process-based objection, we elect to exercise our discretion to reach the merits of his due process claim.
B. Merits
The constitutional right to due process secured by the federal and California Constitutions mandates the suppression of an involuntary confession. ( People v. Linton (2013) 56 Cal.4th 1146, 1176, 158 Cal.Rptr.3d 521, 302 P.3d 927 ( Linton ).) For these purposes, a confession is involuntary if official coercion caused the defendant's will to be overborn, such that the resulting statement is not the product of " ' " ' "a rational intellect and free will" ' [citation]." ' " ( Ibid. ; People v. Guerra (2006) 37 Cal.4th 1067, 1093, 40 Cal.Rptr.3d 118, 129 P.3d 321 ( Guerra ), overruled on other grounds by People v. Rundle (2008) 43 Cal.4th 76, 74 Cal.Rptr.3d 454, 180 P.3d 224.) We judge whether a confession was involuntary by examining *351 the totality of circumstances surrounding the confession. ( Linton , at p. 1176, 158 Cal.Rptr.3d 521, 302 P.3d 927 ; Guerra , at p. 1093, 40 Cal.Rptr.3d 118, 129 P.3d 321.)
1. Officers' circumvention of Miranda
The officers' deliberate circumvention of Miranda 's protections by disregarding defendant's requests for counsel and orchestrating the monitored conversation between defendant and Martinez did not violate due process.
Due process requires coercion and, for the reasons set forth above, defendant's statements to Martinez were not coerced because, as far as he knew, he was talking to his girlfriend. (Accord, Webb , supra , 6 Cal.4th at p. 526, 24 Cal.Rptr.2d 779, 862 P.2d 779 [finding no coercion under Miranda because "[f]rom defendant's perspective, he was talking with a friend and lover"].) The officers' behind-the-scenes manipulation is, at most, a form of deception, but " '[p]olice trickery ... does not, by itself, render a confession involuntary.' " ( People v. Mays (2009) 174 Cal.App.4th 156, 164-165, 95 Cal.Rptr.3d 219.) The *820 trickery here consisted of placing defendant in a room with someone he trusted to see if he would talk. Because the "proximate caus[e]" of his ensuing confession was the conversation -and not the deceptive act of orchestrating its occurrence-the requisite proximate causal link between the police stratagem and defendant's confession is missing. ( People v. Musselwhite (1998) 17 Cal.4th 1216, 1240, 74 Cal.Rptr.2d 212, 954 P.2d 475.)
Absent a showing that the police conduct in this case independently violates due process , defendant is effectively asking us to expand Miranda under the aegis of due process. This we may not do: "Where," as here, "a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive [or procedural] due process," must be the guide for analyzing these claims.' " ( Albright v. Oliver (1994) 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114, quoting Graham v. Connor (1989) 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 ; see also Portuondo v. Agard (2000) 529 U.S. 61, 74, 120 S.Ct. 1119, 146 L.Ed.2d 47 ; cf. Doyle v. Ohio (1976) 426 U.S. 610, 617-618, 96 S.Ct. 2240, 49 L.Ed.2d 91 [due process prohibits use of a defendant's silence after receiving Miranda warnings because such use independently violates due process, as it is "fundamentally unfair" to use a suspect's post-warning silence after implicitly promising not to do so].)
2. Warnings about severity of penalty and threats of jail
The officers' reminders to defendant that the penalty for causing Mia's death was severe, their threat to arrest him immediately if he did not "explain what happened" (by promising not to immediately arrest him if he did), and their reminder that he (and Martinez) were "looking at going to jail" for Mia's death did not violate due process. Law enforcement does not violate due process by informing a suspect of the likely consequences of the suspected crimes or of pointing out the benefits that are likely to flow from cooperating with an investigation. ( People v. Holloway (2004) 33 Cal.4th 96, 115-116, 14 Cal.Rptr.3d 212, 91 P.3d 164 [recounting consequences]; People v. Williams (2010) 49 Cal.4th 405, 442-443, 111 Cal.Rptr.3d 589, 233 P.3d 1000 [same]; People v. Spears (1991) 228 Cal.App.3d 1, 27-28, 278 Cal.Rptr. 506 [benefits that flow from cooperation].) The officers' conduct in emphasizing the severity of the crime at issue and telling defendant that he was "looking at going to jail" for that crime did *352 not transgress these limits. The officers' promise not to arrest defendant immediately if he confessed presents a closer question, but there is no causal link between that promise to give defendant a temporary reprieve from custody if he confessed for the simple reason that that promise did not produce any confession. To the contrary, defendant steadfastly stuck to his *821 initial story and continued to request an attorney. As our Supreme Court recently observed, a defendant's "steadfast[ ] mainten[ance]" of his "innocen[ce]" "tends to undercut the notion that his free will was overborne by the [officer's] remarks." ( Case , supra , 5 Cal.5th at p. 26, 233 Cal.Rptr.3d 439, 418 P.3d 360.)
DISPOSITION
The judgment is affirmed.
We concur:
LUI, P. J.
CHAVEZ, J.

All further statutory references are to the Penal Code unless otherwise indicated.

The People also alleged that defendant personally inflicted great bodily injury (§ 12022.7) regarding the murder, but later dismissed that allegation.

See footnote *, ante .

Orchestrating the conversation between defendant and Martinez clearly constitutes "deliberate elicitation" within the meaning of the Sixth Amendment. (Kuhlmann v. Wilson (1986) 477 U.S. 436, 473, 106 S.Ct. 2616, 91 L.Ed.2d 364 (plurality opinion).) But this is doubly irrelevant: Not only is the Sixth Amendment's "primary concern" with stopping "secret interrogation" different from Miranda 's concern with stopping the coercion inherent in incommunicado interrogation (id. at p. 459, 106 S.Ct. 2616 ; Roberson , supra , 486 U.S. 675, 685, 108 S.Ct. 2093 ), but the Sixth Amendment is also inapplicable here because defendant was not yet formally charged with any crime at the time of his confession (Moran v. Burbine (1986) 475 U.S. 412, 428, 106 S.Ct. 1135, 89 L.Ed.2d 410 (Moran ) ).