Filed 7/22/24  P. v. Allen CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B328333 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA104090) |
| v. | |
| DAVID LEE ALLEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Judith Levey Meyer, Judge.  Affirmed.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant David Lee Allen of first degree murder and two counts of premeditated attempted murder. On appeal, he challenges admission of statements he made to a police agent posing as a fellow inmate. Defendant's principal argument is that his statements were inadmissible because three days earlier, when interviewed by police officers, he invoked his right to remain silent under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Following *People v. Orozco* (2019) 32 Cal.App.5th 802 (*Orozco*), we reject defendant's argument. *Miranda* does not apply when, as here, a defendant speaks to a person who he believes is a fellow inmate. (*People v. Williams* (1988) 44 Cal.3d 1127, 1141–1142 (*Williams*).)

## FACTUAL BACKGROUND

Defendant, Khalif Ferguson, and Jasper Ferguson were members of the Harbor City Crips. Khalif and Jasper are cousins. On March 5, 2014, at approximately 9:40 p.m., there was a shooting outside the Sahara Lounge in Harbor City (Lounge). The Harbor City Crips claimed territory that included the Lounge. Defendant lived nearby.

After the shooting, Shailo Leafa was unresponsive, Che Potasi was bleeding profusely, and their friend, Miles Mageo, survived the shooting unscathed. Leafa died of a gunshot wound to his torso.

A few minutes after the shooting, Potasi told a law enforcement officer three "male blacks, out of nowhere, just shot me . . . ."[1] Video surveillance from a nearby restaurant showed

[1] In a discussion outside the presence of the jury, defendant's counsel referred to defendant as an African-American male.

flashes. Video surveillance from a nearby car wash showed three individuals walking through an alley behind the Lounge.

Potasi testified at trial that he did not remember much. When interviewed in August of 2016, he told a detective that he and Leafa were involved in a gang confrontation at a gas station near the Lounge prior to the shooting. During that confrontation, Potasi identified himself as a member of a blood gang from Piru and the other persons identified themselves as members of the Harbor City Crips.

In 2016, police received a tip via an anonymous hotline stating that Jasper Ferguson was involved in the shooting at the Lounge. A detective determined that Jasper's former girlfriend provided that tip, and when the detective spoke to her, he learned about defendant's participation in the shooting. She told the detective that Jasper told her there was an incident at a gas station that led to a shooting at the Lounge. According to Jasper's ex-girlfriend, Jasper referred to himself, Khalif, and defendant as involved in the shooting. Although Jasper specifically said that defendant was present, Jasper did not indicate whether or not defendant was a shooter.

Police arrested defendant for murder and took him into custody. On May 1, 2016, a detective placed a police agent (agent) in defendant's cell. An audio recording of defendant's statements was played for the jury. Defendant told the agent that he was from Harbor City Crips. Defendant asked the agent, "What they got you for?" and the agent responded home invasion with gang allegations and false imprisonment. Defendant indicated he was in custody for first degree murder. After talking about someone's first "mission," defendant said, "I've been doing

3

this for 12 years, man. . . . I know what I'm doing, man. This shit fun, doing this shit for fun trying to sit back [Unintelligible]."

Defendant told the agent about the events underlying his crimes. "A homey pulled up at the gas station. . . . I told him where he was from. And they was like, what—we don't give a fuck . . . . What's up?" "Jumped in his car and left. They went running back to that lounge." The agent asked, "You guys were all strapped on?" Defendant responded, "Hell yeah. . . . This shit was fun." Defendant said that his "shit jammed" because "[t]he firing pin [w]as fucked up." The agent asked, "And those fools didn't even try to shoot, huh?" Defendant responded that they had "stashed their pistols" near a trashcan. Later in the interview, defendant said that he was not an "OG"; he was still young. But he had been in the "hood" for "a very long time."

## PROCEDURAL BACKGROUND

On April 28, 2016, three days before the conversation in defendant's cell with the agent posing as a fellow inmate, a detective and an officer interviewed defendant. They told defendant that they had spoken to Khalif and Jasper Ferguson. The detective read defendant his rights under *Miranda* but did not obtain a waiver of those rights. Defendant said he would "like to remain silent." After defendant said he wanted to remain silent, the detective and officer continued questioning him. Defendant repeated, "I'd like to be quiet" and the detective and officer continued questioning him. Defendant initially denied being at the Lounge during the shooting but later said that he was the lookout.

In a first amended information filed September 25, 2017, the People charged defendant, Khalif and Jasper Ferguson with murder (Leafa) and two counts of attempted murder (Potasi and

4

Mageo). With respect to defendant, the People also alleged firearm enhancements and that the murder and attempted murder were committed for the benefit of, at the direction of, or in association with, a criminal street gang.

Prior to trial, defendant filed a motion to suppress his confession, challenging the admission of his statements made April 28, 2016 as well as those made May 1, 2016. Defendant argued the latter statements, which he made to the agent, were the fruit of the poisonous tree. The People did not oppose defendant's challenge to his statements made on April 28, 2016. The court denied defendant's motion to suppress his May 1, 2016 statements to the agent. At a hearing, the court stated, "I think the police did this on purpose. They did not get any statements during *Miranda* interviews, and so they set up another form of trying to get a statement that the courts and the Supreme Court has deemed lawful under *Perkins*."

In a written order, the court rejected defendant's argument that the statements to the agent was the fruit of the poisonous tree. At the hearing, the court further indicated that defendant's May 1, 2016 statements were "attenuated" and defendant spoke freely and voluntarily to the agent.

Defendant was tried alone. The jury convicted defendant of the first degree murder of Leafa and premeditated attempted murders of Potasi and Mageo. With respect to each offense, the jury found true that defendant personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (c) and (d) and personally used a firearm within the meaning of section 12022.53, subdivision (b). The court bifurcated the gang enhancement allegation and then later dismissed that allegation. The court sentenced defendant to

5

45 years to life for the murder, and consecutive life terms for each attempted murder.  Defendant timely appealed.

## DISCUSSION

The People refer to the agent in this case as a *Perkins* agent based on *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*), which considered whether *Miranda* applies when, as here, a law enforcement agent pretends to be an inmate.  We begin with a brief description of *Miranda* and *Perkins*, which are central to defendant's argument that *Perkins* does not apply if a defendant previously invoked his right to remain silent under *Miranda*.  We also describe *Orozco, supra,* 32 Cal.App.5th 802, which considered and rejected the same argument defendant makes here, i.e., that *Perkins* does not apply because in the April 28, 2016 interview, defendant invoked his *Miranda* right.

### A.    *Miranda, supra,* **384 U.S. 436**

The Fifth Amendment provides, "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  (U.S. Const., 5th Amend.)  *Miranda* involved the admissibility of statements made by a defendant "subjected to custodial police interrogation."  (*Supra,* 384 U.S. at p. 439.)  The *Miranda* court set forth *requirements* to preserve the defendant's Fifth Amendment right against self-incrimination.  (*Ibid.*)  These now well-known rights include the right to remain silent, which defendant invoked when police interviewed him on April 28, 2016.  (*Id.* at pp. 444–445.)  To enforce the right to remain silent, *Miranda* bars admission in the prosecution's case in chief of statements made in violation of a defendant's *Miranda* rights. (*People v. Hoyt* (2020) 8 Cal.5th 892, 931.)

6

The interviews at issue in *Miranda* were "incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." (*Miranda, supra*, 384 U.S. at p. 445.) The *Miranda* court observed such an atmosphere generates "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." (*Id*. at p. 467.) The *Miranda* court contrasted statements so generated with statements "given freely and voluntarily without any compelling influences is, [which are] of course, admissible in evidence." (*Id*. at p. 478.) "Volunteered statements of any kind are not barred by the Fifth Amendment . . . ." (*Ibid*.)

## B.    *Perkins*, *supra*, 496 U.S. 292

*Perkins* held that *Miranda*'s warnings were unnecessary when a suspect was unaware that he or she was talking to a law enforcement officer. In *Perkins*, a law enforcement agent posed as an inmate. The agent clothed in jail garb asked the defendant if "he had ever 'done' anybody" and the defendant described a murder that the agent was investigating. (*Supra*, 496 U.S. at p. 295.) The high court granted certiorari "to decide whether an undercover law enforcement officer must give *Miranda* warnings to an incarcerated suspect before asking him questions that may elicit an incriminating response." (*Perkins*, at pp. 295–296.) The high court held that "*Miranda* warnings are not required when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement." (*Perkins*, at p. 294.)

The high court explained, "Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*." (*Perkins, supra*, 496 U.S. at p. 296.) "The essential

7

ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate.  Coercion is determined from the perspective of the suspect.  [Citations.]  When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking."  (*Ibid*.)  The high court reasoned:  "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner.  As we recognized in *Miranda*, '[c]onfessions remain a proper element in law enforcement.  Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.'  [Citation.]  Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns."  (*Perkins*, at p. 297.)

Justice Brennan concurred in the high court's judgment.  He agreed that there was no coercion when a suspect does not know the questioner was a police agent.  (*Perkins*, *supra*, 496 U.S. at p. 300.)  According to Justice Brennan, "[S]uch questioning does not amount to 'interrogation' in an 'inherently coercive' environment so as to require application of *Miranda.* (*Perkins*, at p. 300.)  In a footnote, Justice Brennan stated, "As the case comes to us, it involves only the question whether *Miranda* applies to the questioning of an incarcerated suspect by an undercover agent.  Nothing in the Court's opinion suggests that, had respondent previously invoked his Fifth Amendment right to counsel or right to silence, his statements would be admissible.  If respondent had invoked either right, the inquiry

8

would focus on whether he subsequently waived the particular right." (*Id*. at p. 300, fn. *.)

Justice Marshall dissented, concluding that the conditions requiring a *Miranda* warning were present and the defendant's confession was therefore inadmissible. (*Perkins*, *supra*, 496 U.S. at pp. 303–304.) Justice Marshall disagreed with the majority rule that an "exception" to *Miranda* applied "whenever 'an undercover law enforcement officer posing as a fellow inmate . . . asks questions that may elicit an incriminating response' from an incarcerated suspect." (*Perkins*, at p. 304.) Justice Marshall wrote that the defendant "was subjected to express questioning likely to evoke an incriminating response." (*Id*. at p. 305.) Justice Marshall expressed concern that "[t]he exception carved out of the *Miranda* doctrine today may well result in a proliferation of departmental policies to encourage police officers to conduct interrogations of confined suspects through undercover agents, thereby circumventing the need to administer *Miranda* warnings." (*Perkins*, at p. 309.)

## C.     *Orozco, supra*, 32 Cal.App.5th 802

*Orozco* considered whether a suspect's invocation of his or her *Miranda* rights "preclude[s] the admission of a confession a suspect subsequently makes to a person he is unaware is functioning as an agent of law enforcement." (*Supra*, 32 Cal.App.5th at p. 806.) The court also considered whether the continued questioning of a suspect after the suspect invoked his or her *Miranda* rights violates due process. (*Ibid*.)

*Orozco*'s facts are tragic. Six-month-old Mia died of blunt force trauma while in the defendant's custody. (*Supra*, 32 Cal.App.5th at pp. 806–807.) In his first interview with law enforcement, the defendant denied inflicting any bruises and

requested an attorney. (*Id*. at p. 807.) After his arrest for Mia's murder, defendant again requested an attorney and the questioning officer said, " 'All right. Go to jail. Done.' " (*Id*. at p. 808.) After receiving instructions from police, the defendant's girlfriend, who was also Mia's mother, spoke to the defendant while he was in custody and their conversation was recorded. (*Ibid*.) During the course of that conversation, the defendant admitted to Mia's mother that he " 'fucking killed Mia.' " (*Id*. at p. 809.)

The trial court denied the defendant's motion to suppress the defendant's confession. (*Orozco, supra*, 32 Cal.App.5th at p. 810.) The trial court ruled that although Mia's mother was an agent of the police, the defendant was unaware of her role as a police agent and believed he was talking to his girlfriend. (*Ibid*.) A jury convicted defendant of second degree murder and assault causing death of a child. (*Ibid*.)

As in this case, the defendant argued that the trial court erred in failing to suppress his confession under *Miranda* and in violation of due process. (*Orozco, supra*, 32 Cal.App.5th at p. 811.) *Orozco* rejected these arguments and relied heavily on the definition of interrogation in *Miranda*. As our colleagues in Division Two explained, "For purposes of *Miranda*, 'interrogation' means 'express questioning' or 'words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response.' [Citation.] Because interrogation 'reflect[s] a measure of compulsion above and beyond that inherent in custody itself' [citation], not all statements a defendant makes while in custody are 'the product of interrogation' [citation]. Whether the police action is 'reasonably likely to elicit an incriminating response' is judged by

10

what the suspect perceives, not what the police intend. [Citation.] Implicit in the definition of 'interrogation' is that (1) the suspect is talking to the police or an agent of the police, *and* (2) the suspect *is aware* that he is talking to the police or one of their agents. This is why a suspect can be subject to 'interrogation' when he knowingly interacts with the police or their agents." (*Orozco*, at p. 813.) "Conversely, there is no 'interrogation' when a suspect speaks with someone he does not know is an agent of the police." (*Id.* at p. 814.)

Following *Perkins*, *Orozco* held a defendant is not subject to a police dominated atmosphere of compulsion when a defendant speaks freely to someone he thinks is a "lover, a family member, a friend or even a fellow criminal . . . ." (*Orozco*, *supra*, 32 Cal.App.5th at p. 814.) "To construe *Miranda* to reach the noncoercive police conduct in this case is to untether *Miranda* from its purpose and, in so doing, undermine its legitimacy as one of the many bulwarks protecting the constitutional rights of criminal defendants. We decline to sully *Miranda* in this fashion." (*Orozco*, at p. 817.)

*Orozco* rejected the defendant's argument that *Edwards v. Arizona* (1981) 451 U.S. 477 required the suppression of the defendant's statements. *Edwards* holds that a suspect "having expressed his desire to deal with the police only through counsel[ ] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards*, at pp. 484–485.) *Orozco* explained that *Edwards* applied only where there was interrogation. (*Orozco*, *supra*, 32 Cal.App.5th at p. 813.) In *Orozco,* there was no interrogation because the defendant did not

11

know he was speaking to an agent of the police when he was speaking with his girlfriend. (*Id.* at p. 814.)

*Orozco* rejected the defendant's reliance on Justice Brennan's concurring footnote in *Perkins*. *Orozco* regarded that footnote as an opinion of a single justice, and dicta at that, and further noted Justice Brennan himself acknowledged that the questioning of the defendant in *Perkins* by an agent posing as an inmate does not constitute an interrogation. (*Orozco, supra,* 32 Cal.App.5th at p. 815.)

*Orozco* rejected the defendant's argument that *Perkins* should not control because the defendant invoked his right to counsel under *Miranda* prior to the interview with his wife. (*Orozco, supra,* 32 Cal.App.5th at p. 815.) *Orozco* concluded that the defendant's statements to his girlfriend "were voluntary because he (mistakenly) believed he was having a private conversation with his girlfriend; he had no idea that police were exerting any pressure on him at all." (*Id.* at p. 818.)

In addition to rejecting the defendant's challenge based on *Miranda*, the *Orozco* court rejected the defendant's challenge based on due process explaining that for purposes of due process, a "confession is involuntary if official coercion caused the defendant's will to be overborn, such that the resulting statement is not the product of ' " ' " 'a rational intellect and free will.' " [Citation.]' " ' [Citations.]" (*Orozco, supra,* 32 Cal.App.5th at p. 819.) The court so held even acknowledging the deliberate circumvention of *Miranda* by "orchestrating" the conversation between defendant and his girlfriend. Simply put, the statements were not coerced because defendant believed he was speaking to his girlfriend. (*Orozco,* at p. 819.)

12

## D. The Trial Court Properly Admitted Defendant's Statements to the Agent

Turning to the appeal before us, defendant repeats the arguments *Orozco* rejected without arguing that *Orozco* was wrongly decided. In his opening and reply briefs, defendant states he "acknowledges" that his contention *Perkins* does not apply because he previously invoked his right to remain silent under *Miranda* "was rejected" in *Orozco*. Defendant, however, offers no basis for this court not to follow *Orozco*.

*Orozco* is persuasive. Applying its reasoning here, notwithstanding defendant's invocation of his right to remain silent on April 28, 2016, the trial court properly admitted defendant's statements made May 1, 2016 to an agent posing as an inmate. Defendant's statements to the agent were not coerced; they were voluntarily made because he believed that he was speaking to an inmate. In the words of our high court, *Miranda* does not apply "to conversations between an inmate and an undercover agent. This is because *Miranda* warnings serve to dispel the coercive effect of *police custodial* questioning. . . . When a defendant talks to a fellow inmate, the coercive atmosphere of custodial police interrogation is absent." (*Williams, supra,* 44 Cal.3d at pp. 1141–1142.)

We also reject defendant's due process claim, which depends on the premise his "statements to the *Perkins* agent [were] involuntary."[2] On appeal, defendant's theory is that

---

[2] Defendant represents on appeal that in the trial court, he argued that his May 1, 2016 statements violated due process. His citation to the record, however, shows only that he challenged the April 28, 2016 statements on due process grounds. Although defendant does not show he has properly preserved his due

13

because he invoked his *Miranda* rights, the *Perkins* operation was improper. According to him, he chose not to speak to police and the police "disguise[d]" an interrogation by using an agent. He argues due process was violated because police used the agent to circumvent *Miranda*. Defendant does not challenge the trial court's finding that the police "did not get any statements during *Miranda* interviews" and does not argue that any specific information learned in the earlier interview was used in the *Perkins* operation.

As in *Orozco*, in which the defendant's statements were not coerced because the defendant believed he was talking to his girlfriend, here defendant's statements were not coerced because he believed he was talking to a fellow inmate. Defendant has not demonstrated that the *Perkins* operation violated his right to due process.

---

process challenge to his May 1, 2016 statements, we chose to consider that challenge on the merits.

Because defendant shows no error in the admission of defendant's May 1, 2016 statements, we do not consider defendant's argument that admission of those statements was prejudicial.

14

## DISPOSITION

The judgment is affirmed.
<u>NOT TO BE PUBLISHED.</u>


                                               BENDIX, Acting P. J.


We concur:


WEINGART, J.


KELLEY, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15