Filed 5/25/21  P. v. Gutierrez CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B302264 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA104376) |
| v. | |
| ULISES JOSE GUTIERREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Affirmed.

Marilee Marshall for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael Keller and Paul S. Thies, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant and appellant Ulises Jose Gutierrez of two counts of first degree murder (Pen. Code, § 187, subd. (a); counts 1 & 8)[1] and three counts of willful, deliberate, and premeditated attempted murder (§§ 664, 187, subd. (a); counts 5, 6 & 7).[2]

The jury found true allegations that, as to counts 1, 5, and 7, defendant personally discharged a firearm (§ 12022.53, subd. (d)); as to count 6, defendant personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)) and caused the victim great bodily injury (§ 12022.7, subd. (a)); as to count 8, a principal personally discharged a firearm (§ 12022.53, subds. (d) & (e)(1)); and, as to counts 1, 5, 7, and 8, the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C).)

Finally, the jury found true a multiple murder special circumstance allegation (§ 190.2, subd. (a)(3)) and, as to counts 1 and 8, the special circumstance allegation that defendant carried out the murder to further the activities of a criminal street gang of which he was an active participant (§ 190.2, subd. (a)(22)).

The trial court sentenced defendant to an aggregate term of life without the possibility of parole plus 104 years to life in state prison.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    Defendant was found not guilty of one murder count (count 9).

In this timely appeal, defendant argues that his incriminating statements to undercover jail informants were coerced and, therefore, the admission of those statements at trial violated his constitutional rights.

We affirm.

**BACKGROUND[3]**

I. *Defendant's Statements to Undercover Informants*

As part of an investigation into the May 2013 shooting of Raymond Vasquez (Vasquez),[4] the Los Angeles County Sherriff's Department conducted a *Perkins*[5] operation, which entailed placing an undercover agent posing as an inmate in a cell with a suspect to elicit incriminating statements. Defendant was arrested on January 16, 2014, taken to the Sheriff's Station in San Dimas, and placed in a jail cell with two undercover informants, who were paid for their participation in the *Perkins* operation.

Defendant initiated a conversation by asking, "What's up, G?" Informant 2 asked defendant, "You a homie?" Defendant responded that he was from the Northside Bolen gang. He told the informants that he was 20 years old and had been with the gang since he was 12 or 13 years old. Defendant stated: "I've

---

[3]    Because defendant does not challenge the sufficiency of the evidence supporting his convictions and no prejudice analysis is required, we only summarize the facts pertinent to defendant's claim that his incriminating statements were coerced.

[4]    Vasquez's murder was the basis of count 1.

[5]    *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).

been all over, my boy. *When they call me for Eme,*[6] like, all over."[7]

Defendant explained that he was being implicated in a murder and that someone was "snitching[.]" At first, defendant denied knowing about a murder. He asked the informants whether the evidence that the police said they had—that is, a witness who would testify, text messages, and phone calls— would be sufficient. Informant 2 asked defendant, "Dude, someone's telling on you that was there?" Defendant responded, "I know who it is. No, not that was there."

Both informants told defendant that they were "red band" meaning "[h]igh power." Informant 2 stated: "I had the whole county last time I was there, so they red band me every time I go."[8] Informant 2 explained that he did a "*job*" for Fox—a "*big homie*" who "got the county right now[.]"[9] Informant 1 mentioned that he was related to Fox. Informant 2 stated, "once we get

---

[6]     "Eme" refers to the Mexican Mafia.

[7]     Italicized text denotes translations from Spanish.

[8]     At trial, the defense gang expert, Martin Flores (Flores), testified that "when somebody says 'I had the county' they were literally running the operations in terms of the Surenos gang in the Los Angeles County Jail and they work closely with one or multiple [Mexican Mafia] members that may have been housed during that time frame."

[9]     Flores testified that Fox was a member of the Mexican Mafia, who "had major influence in Los Angeles County Jail."

4

downstairs, we're gonna have everything we want."[10]  He also said that he had been "down there with Lalo" and "Fly."[11]

Informant 2 suggested that he could do defendant "a favor" regarding the witness.  This piqued defendant's interest; he wanted to hear more about how Informant 2 could "help" him.  Soon after, a deputy sheriff came to the cell to get defendant for more interviews.  Informant 2 asked if the deputy was going to bring him back.  The deputy asked defendant if he wanted to come back to the cell.  Defendant responded, "I'll feel fucked up by myself in a cell."

Defendant later returned to the cell with the informants per his request.  He told them that he was now being implicated in other murders and attempted murders, and was facing the death penalty.

Informant 2 again suggested that he could kill the witness for defendant but could not make any promises.  He told defendant:  "[I]f I find the fool for you, if I whack him, you're gonna owe me a favor.  You know that; right?"  Defendant responded:  "I'm a rider,[12] dog.  I'll do anything you say."

---

[10]  Flores explained at trial that "'going downstairs' is basically going to where decisions are made . . . .  In this case it would be most likely Men's Central Jail which is where the high ranking Mexican Mafia members will be housed and/or where the most action is taking place."

[11]  Per Flores's trial testimony, Lalo and Fly were Mexican Mafia members.  Fox, Lalo, and Fly were "three of the most powerful individuals in Los Angeles County Jail[.]"

[12]  According to the Sheriff's Department report regarding the *Perkins* operation, a rider is "street slang for an individual who is committed to the gang[.]"

Informant 2 said that he needed defendant to tell him "everything" so that he "could do all [his] homework . . . ." He told defendant: "[W]hen I ask you a question, I want you to answer me honestly and not lie to me and bullshit me." Informant 2 asked how he could know if defendant was a "rider[,]" and defendant said that the informant should ask people in Pelican Bay[13] about him. Defendant stated that he had been "gangbanging" for seven years.

Defendant explained that the police knew about three murders and an attempted murder. Regarding why he shot one of the victims, defendant stated: *"Because his son, he had beef with the barrio. I said, 'Well, I'm going to go.'* So I went to the hood." There was also an incident involving "Maria" during which she "got shanked up."[14] Defendant said that he "was this close to kill [*sic*] her" but was stopped.

Informant 2 told defendant: "We're gonna get you out, but remember you're willing to do anything for me; right?" Defendant responded, "I'm gonna do everything, my boy." Informant 2 clarified, "Even kill people; right?" Defendant replied, "Shhh, and that ain't nothing to me."

II. *Relevant Trial Court Proceedings*

On November 13, 2018, defendant filed a motion to exclude all evidence obtained through the *Perkins* operation conducted in

---

[13] Defendant was presumably referring to Pelican Bay State Prison.

[14] The attempted murder of Maria Moreno with a knife was the basis of count 6.

6

January 2014.[15] Defendant argued that "the operation . . . went far beyond merely 'listening' to statements by a suspect. Rather, . . . [the informants] used their age and experience to play upon the fears, naivete, and youthfulness ([defendant] was 20 at the time) of the defendants, by making promises and exacting commitments as part of their shared gang culture."

During oral argument on August 28, 2019, defense counsel contended that defendant's statements to the undercover informants were the result of implied coercion because they followed "very intense . . . pressure being put on him by these very obviously older and larger individuals[16] who have spoken to him about politics at the jail. What he's gonna have to do about the Mexican Mafia individuals that they're familiar with who run the county, mentioning a Fox and a Lalo. . . . [T]his is all part of their efforts to exert some sort of coercion. It's not the rubber hose treatment, of course. But, nonetheless, . . . coercion can be implied."

The trial court denied the motion to exclude, and a recording of defendant's conversations with the undercover informants was played for the jury as part of the People's case-in-chief.

---

[15] Apart from defendant, there were four other subjects of the *Perkins* operation. On appeal, defendant only challenges the admission of his own statements.

[16] At the time, one of the informants was in his early to mid 30's, weighed 275 to 325 pounds, and was between 5 feet 8 inches and 5 feet 11 inches tall. The other informant was in his late 20's to early 30's and between 5 feet 6 inches and 5 feet 8 inches tall.

7

The defense called Flores, a gang expert, to testify. Flores was familiar with the two men used as undercover informants in the *Perkins* operation and believed that they could be "intimidating to a new person being incarcerated." According to Flores, by mentioning Fly, Lalo, and Fox, one of the informants was showing that he had a connection to "major players" and had "influence with them at the county jail." Flores also opined that younger gang members have a tendency to boast in the presence of older gang members, especially "in a setting where somebody is going to be housed at for a period of time" like the county jail.

## DISCUSSION

The sole issue raised in this appeal is whether defendant's statements to the undercover informants during the *Perkins* operation were coerced and, therefore, inadmissible.

### I. *Standard of Review*

Whether defendant's incriminating statements were voluntary or coerced is a mixed question of law and fact affecting constitutional rights, to which we apply de novo review. (*People v. Cromer* (2001) 24 Cal.4th 889, 901.)

### II. *Applicable Law*

The constitutional protections set forth in *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) do not apply when a criminal suspect does not know that he is speaking to a law enforcement officer or an undercover informant. (*Perkins*, *supra*, 496 U.S. at p. 294; *People v. Davis* (2005) 36 Cal.4th 510, 554.) The concerns underlying *Miranda*—"that a 'police-dominated atmosphere' generates 'inherently compelling pressures' that 'undermine the individual's will to resist' questioning"— "evaporate when, as here, an inmate speaks freely to someone he

8

believes is a fellow inmate." (*People v. Rodriguez* (2019) 40 Cal.App.5th 194, 198 (*Rodriguez*).)

The due process clauses of the federal and California Constitutions nevertheless bar the admission of an involuntary confession regardless of whether the suspect knows he is speaking to law enforcement. (*Rodriguez, supra*, 40 Cal.App.5th at p. 199.) "Involuntariness means the defendant's free will was overborne." (*People v. DePriest* (2007) 42 Cal.4th 1, 34 (*DePriest*).) "'A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence.' [Citation.] However, 'no single factor is dispositive in determining voluntariness . . . rather[,] courts consider the totality of circumstances.'" (*People v. Wall* (2017) 3 Cal.5th 1048, 1066 (*Wall*).)

"Deception does not necessarily invalidate an incriminating statement." (*People v. Maury* (2003) 30 Cal.4th 342, 411 (*Maury*); see also *People v. Orozco* (2019) 32 Cal.App.5th 802, 819 (*Orozco*) ["'"[p]olice trickery . . . does not, by itself, render a confession involuntary[]"'"].) "'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.'" (*Maury, supra,* at p. 411.)

III. *Analysis*

Based on the totality of the circumstances surrounding defendant's conversations with the undercover informants (see *Wall, supra,* 3 Cal.5th at p. 1066), we conclude that his incriminating statements were voluntary and not the product of coercion.

Both informants made statements conveying their connections to the Mexican Mafia and influential gang figures. Informant 2, in particular, encouraged defendant to speak in detail about his crimes. "Certainly," the informants were "more than . . . passive listener[s]." (*People v. Fayed* (2020) 9 Cal.5th 147, 166.) But the informants did not physically threaten defendant with violence, use other tactics likely to procure an unreliable response, or make promises. (See *ibid.* [incriminating statements made to a cellmate, who "coaxed and prodded [the] defendant when he hesitated to speak," were not coerced]; cf. *Arizona v. Fulminante* (1991) 499 U.S. 279, 288 [alleged child murderer's confession to fellow inmate was coerced because it was motivated by "fear of physical violence, absent protection from his friend (and Government agent)"].) To the contrary, Informant 2 emphatically stated that he wanted defendant to be honest with him. Informant 2 also explicitly told defendant that he could not make any promises about killing the witness.

Nor, having listened to the recordings of the conversations and reviewing the transcripts, do we find anything to suggest that defendant was fearful of the informants. Defendant initiated the conversation and early on boasted about his gang bona fides. He frequently laughed with them and asked questions. He repeatedly used the terms "fool" and "my boy" to refer to the informants casually and with familiarity. When defendant was removed from the cell for additional interviews with detectives, he requested to be returned to the same cell as the informants. Thus, given the opportunity to be separated from them, defendant actively sought to return to them.

Urging us to find coercion, defendant asserts that he invoked his *Miranda* rights when interrogated by detectives

10

following his arrest[17] and was subsequently placed in the cell with the undercover informants.  Defendant claims that he did not make any incriminating statements to the informants until after he was removed from the cell for further interrogation by detectives (during which he was told about several additional charges against him) and then returned to the cell with the informants.  Defendant acknowledges that *Miranda* is inapplicable to his statements to the informants because he was unaware at the time that they were acting under the direction of law enforcement.  (*Perkins*, *supra*, 496 U.S. at p. 294.)  He nevertheless contends that interspersing his contact with the informants with further police interrogation was a coercive tactic meant to evade *Miranda*, which also violated his rights under *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*).

We are unpersuaded.

First, while defendant was more forthcoming with the informants when he returned to the cell following the additional interviews with detectives, he had still made incriminating statements before he was removed for those interviews.  For example, he stated that the witness was not someone who was present at the crime.  Defendant had also already expressed interest in the possibility of Informant 2 killing the witness.  Thus, the record undermines the suggestion that "defendant's

---

[17]    The People argue that the appellate record does not demonstrate that defendant actually invoked his *Miranda* rights when he was interviewed by detectives.  The record is ambiguous in this respect, but for the sake of argument we accept defendant's representation that he did invoke his rights.

11

free will was overborne" (*DePriest*, *supra*, 42 Cal.4th at p. 34) by the additional questioning by law enforcement.

Second, even if police engaged in "deliberate circumvention of *Miranda*'s protections by disregarding defendant's requests for counsel and orchestrating the monitored conversation between defendant and" the informants, due process was not violated. (*Orozco*, *supra*, 32 Cal.App.5th at p. 819.)  To find otherwise here would be "to expand *Miranda* under the aegis of due process. This we may not do[.]"  (*Orozco*, *supra,* at p. 820.)  This remains true even though defendant's contact with the informants was interrupted by additional interviews with detectives.  (See *id.* at pp. 808–809, 819–820 [no violation of due process where a defendant confessed to killing his daughter during a conversation with the child's mother, which followed the defendant's invocation of his *Miranda* right to counsel and an interruption of his conversation with the mother by law enforcement].)

Third, defendant's conversations with the undercover informants preceded the initiation of formal judicial proceedings in this case.  Accordingly, *Massiah*, *supra*, 377 U.S. at p. 206, which held that a defendant's incriminating statements elicited after his indictment and in the absence of his counsel violated the Sixth Amendment, is inapplicable.  (See *Rothgery v. Gillespie County, Texas* (2008) 554 U.S. 191, 198 [Sixth Amendment right to counsel commences with the initiation of adversary criminal proceedings through formal charges, preliminary hearing, indictment, information, or arraignment]; *Perkins*, *supra*, 496 U.S. at p. 299 [where no charges had been filed on the subject of the interrogation, Sixth Amendment was inapplicable].)

Having concluded that defendant's statements to the undercover informants were not coerced, we find no error in the trial court's admission of those statements at trial.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT

13