Filed 2/10/26

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, <br><br>    Plaintiff and Respondent, <br><br>    v. <br><br> JASON JOHNOMAR ZAPATA, <br><br>    Defendant and Appellant. | D084024 <br><br><br> (Super. Ct. No. SWF1502085) |

APPEAL from a judgment of the Superior Court of Riverside County, John M. Davis, Judge. Reversed and remanded.

Joseph Doyle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

During what is commonly known as a *Perkins* operation, Jason Johnomar Zapata admitted to two undercover officers that he murdered Justin Triplett.[1] A jury who heard a recording of Zapata's confession convicted Zapata of second degree murder. On appeal, Zapata argues the trial court's admission of his statements violated *Miranda*[2] because he previously invoked his right to an attorney, he did not waive that right when he spoke with the undercover agents, and the involvement of a known law enforcement officer transformed the operation into a custodial interrogation. We agree.

When a suspect invokes and does not waive the right to counsel, and a known law enforcement officer continues to "stimulate" a *Perkins* operation in a manner that amounts to a custodial interrogation, the suspect's resulting incriminating statements are inadmissible. Because the admission of Zapata's statements was prejudicial, we reverse and remand for further proceedings.

## II. BACKGROUND

*A.     Perkins Operation*

Justin Tripplett was killed on September 22, 2014. Suspecting Zapata as the perpetrator, a Riverside County Sherriff's deputy orchestrated a *Perkins* operation approximately one year later while Zapata was in custody for charges unrelated to Triplett's killing. The deputy placed Zapata in a

---

[1]     A "*Perkins* operation" is when an undercover operative is placed in a cell with the suspect to obtain information from the suspect. The term derives its name from *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2

holding cell for approximately three hours and 20 minutes with two law enforcement agents posing as inmates. The deputy recorded the operation and monitored it from nearby, contacting Zapata approximately three times in order to "stimulat[e]" conversation between Zapata and the agents.

When undercover agents questioned Zapata about Triplett's murder, Zapata initially denied being involved. About halfway through the operation, the deputy removed Zapata from the cell for a fake lineup, falsely telling Zapata that a witness identified him as Triplett's killer. During that process, the deputy asked Zapata if he wanted to discuss the murder, and Zapata invoked his right to counsel, stating he wanted a lawyer before any further questioning occurred.

After the lineup, the deputy did not provide Zapata with a lawyer. Instead, he returned Zapata to the holding cell, announcing that he was charging Zapata with murder. The two undercover agents heard the deputy mention the murder charge, and they immediately began asking Zapata about it after the deputy left. Zapata ultimately admitted killing Triplett after the agents continued to press him about the killing. A few months later, the Riverside District Attorney's office charged Zapata with Triplett's murder (Pen. Code,[3] § 187, subd. (a)), alleging that he personally used a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).

B. *Trial Proceedings*

1. Zapata's Motion to Exclude

During his trial in 2023,[4] Zapata moved to exclude his statements to the undercover agents, arguing the *Perkins* operation violated *Miranda*. In

---

[3]     All further undesignated statutory references are to the Penal Code.

[4]     Trial was continued numerous times due to the parties' requests and the COVID-19 pandemic.

assessing the motion, the trial court reviewed an audio recording and transcript of the portion of the operation where Zapata confessed. In that recording, one of the agents asked Zapata if he "smoke[d Triplett] during the day," and Zapata responded, "[i]t was during the day, it was at his house, at his apartment and shit." Zapata stated Triplett "got hit like 10 times," and that he used his .40 caliber Smith & Wesson that he discarded and later reported stolen. Zapata and the agents also discussed potential evidence, with Zapata twice stating he was "worried about the lineup."

In addition, the trial court heard testimony from both Zapata and the deputy who conducted the *Perkins* operation. According to Zapata, he believed he was in imminent danger while in the holding cell with the two agents, so he lied to them and told them what they wanted to hear. Addressing the lineup tactic, the deputy described it this way:

> It was to make [Zapata] believe that there was a lineup occurring, causing, *typically causing* -- and in this case as well, as per the transcript -- him to have concern about the lineup, which is what it did. We saw that. We heard it earlier. We see in the transcript *it caused him a lot of concern. It caused him to want to talk* to, he thought, [ ] other inmates about how to prepare for this. (Italics added.)

The trial court denied Zapata's motion and admitted the portion of the audio recording where Zapata described killing Triplett and discussed the evidence.

2.    Prosecution Evidence

Triplett lived in the Portofino apartment complex in Temecula. On September 22, 2014, around 10 a.m., one of Triplett's neighbors heard knocking on Triplett's door followed by gunshots about 20 seconds later. Two other Portofino residents, a married couple, heard the gunshots when they

4

were unloading groceries in the complex's parking lot. The husband saw a man riding a bike into the complex prior to the gunfire, while the wife saw a man riding a bike away from the complex after the shooting. The couple could not identify the biker because he was wearing a hood, and both the husband and wife were not wearing their prescription glasses.

Responding officers found Triplett lying in the doorway to his apartment dead from 11 gunshot wounds. All nine bullet casings found at the scene had a Hornady logo and were fired from the same gun. Deputies did not find a firearm, but the markings on the casings indicated that they were fired from a .40 caliber Smith & Wesson. Zapata had recently purchased a .40 caliber Smith & Wesson and Hornady ammunition, which he picked up from the gun store just three days before the shooting.

On the day of the shooting, officers found fifteen-year-old R.M. standing outside of the crime scene tape. The following day, R.M. was lighting candles outside of the Portofino apartments, and she told officers that she was very good friends with Triplett.

Several weeks later, R.M. was in police custody on an unrelated matter. She told officers that she witnessed Triplett's murder, and she would disclose the killer in exchange for a deal. After the officers stated they could tell the District Attorney that R.M. had been helpful, R.M. identified Triplett's killer as "J Dog," which is a nickname for Zapata.

R.M. said that Triplett was like a brother to her, and she slept at his apartment the night before the murder. Around 10 a.m. the following morning, "J Dog" knocked on the door. Triplett answered the door and after he and "J Dog" briefly talked, "J Dog" shot Triplett numerous times. Triplett fell halfway in his doorway, and "J Dog" attempted to shoot R.M. inside the apartment but he was out of bullets. "J Dog" left, and when R.M. was

5

running away, she saw him driving a red truck with something in the back that was possibly a bicycle.

R.M. described "J Dog" as wearing a hooded jacket with the hood up. R.M. identified "J Dog's" gun as a "40," stating that she "know[s] guns." Some of the details that R.M. provided, such as the caliber of the murder weapon and the position of Triplett's body in the doorway, had not been disclosed to the public by law enforcement.

By the time R.M. testified at Zapata's trial, she was 24 years old. She said that her previous statements to the police were not true. She denied being present during the shooting or being close with Triplett. The trial court commented that R.M. paused and acted nervously to "virtually every question that she was asked . . . by both sides . . . and about half the time she never did answer the question."

Police also interviewed Eligha Everett a few weeks after the murder. Everett was friends with Triplett and Zapata. At the time of Everett's police interview, the police suspected he killed Triplett.[5]

During the interview, Everett accused Zapata of killing Triplett. Everett said the night before murder, he and R.M. were at Zapata's house. Zapata was "high as hell," walking around his house with a gun, and talking about an incident where Triplett came over to Zapata's house and upset Zapata's mother. Everett slept at Zapata's house and departed early the following morning while R.M. was still there. Everett received a call from R.M. saying that Zapata got in his truck, threw his bike in the back, and was " 'gonna do something.' " Everett then saw Zapata driving near the Portofino

---

[5]     Police later discovered surveillance footage and medical records indicating that Everett was visiting two medical clinics at the time of the killing.

apartments in his truck with a bike. Later that day in a phone call, Everett asked Zapata "[y]ou know what you did?" to which Zapata replied " 'yeah' " and hung up. Everett viewed this as an admission.

When Everett testified at Zapata's trial, he denied that Zapata admitted killing Triplett, and he said there was no "beef or disagreement" between Zapata and Triplett at the time of the killing. Everett confirmed that he saw Zapata driving by the Portofino apartments the morning of the murder, but he could not recall if there was a bicycle in the back of Zapata's truck. Everett otherwise testified consistently with his prior statements to the police about the events leading up to the murder.

The prosecution also presented testimony from two security guards who witnessed an incident near the Portofino apartments a week before Triplett's killing. After the guards approached Zapata in his red truck with Delon Fuller in the passenger seat, Fuller threw a bag containing drugs out of the window. Later that night the guards found Triplett looking for the bag, and Zapata sped towards them in his truck while Triplett shouted " '[s]top J-Dawg.' "

### 3. Defense Evidence

Zapata testified in his own defense. He denied killing Triplett, telling the jury he had no reason to do so and he did not recall any incident where Triplett caused a disturbance at his house. Zapata said that R.M. slept at his house the night before the killing and she left the following morning traveling in the direction of the Portofino apartments on foot. Zapata did not otherwise recall that day. Zapata also told the jury that he noticed his gun was missing after officers searched his house, and he reported it as stolen to the police.

<u>4.</u>    <u>Verdict</u>

The jury found Zapata not guilty of first degree murder, but guilty of second degree murder.  The jury was unable to reach a verdict on the personal firearm enhancement under section 12022.53, subdivision (d).  After the trial court declared a mistrial on that allegation, Zapata admitted the lesser enhancement under section 12022.53, subdivision (b) (i.e., firearm use without causing great bodily injury or death) pursuant to a plea agreement with the People.  The trial court sentenced Zapata to prison for 15 years to life for the murder, plus 10 years for the firearm use.  Zapata timely appealed.

## III. DISCUSSION

### A.    *Standard of Review*

" 'In reviewing the trial court's denial of a suppression motion on *Miranda* and involuntariness grounds, " ' "we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.  We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." ' " ' "  (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

### B.    *Miranda, Innis, Edwards, and Perkins*

"*Miranda* established the now-familiar rule that prosecutors may not admit a suspect's statements in their case-in-chief against the suspect-defendant unless" prior to making those statements, the suspect was properly advised of the right to remain silent and the right to an attorney.  (*People v. Orozco* (2019) 32 Cal.App.5th 802, 811 (*Orozco*).)  *Miranda* was based on the Fifth Amendment privilege against self-incrimination, which "has consistently been accorded a liberal construction."  (*Miranda, supra*, 384 U.S.

8

at p. 461.)  The exercise of that privilege "will be scrupulously honored," and "the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' " (*Id*. at pp. 460, 479.)

"Critically, however, *Miranda's* rule has a limit:  It only applies when the suspect-defendant was the subject of 'custodial interrogation' " because those circumstances " 'contain[] inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so.' " (*Orozco, supra*, 32 Cal.App.5th at pp. 811–812.)  "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301 (*Innis*).)[6]

In *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*), the United States Supreme Court explained that once such a suspect invokes his or her *Miranda* rights against self-incrimination, "further police-initiated custodial interrogation" is prohibited unless counsel is present or the suspect "initiates further communication" with the police. (*Edwards*, at pp. 484–485.) "[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege." (*Id*. at p. 482.)

On the other hand, in *Perkins*, the United States Supreme Court addressed the scenario that has now become known as a *Perkins* operation.

---

[6]    We note that custodial interrogation has two components:  (1) custody and (2) interrogation.  (*People v. Mosley* (1999) 73 Cal.App.4th 1081, 1088–1089.)  We primarily focus on interrogation because there is no dispute that Zapata was in custody when he spoke to the undercover agents.

There, an undercover officer (dressed as an inmate), along with a cooperating former inmate entered a suspect's jail cell and, without first giving *Miranda* warnings, inquired of the suspect regarding the crime the officer was investigating. (*Perkins, supra*, 496 U.S. at pp. 294–295.) The high court held "that an undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response." (*Perkins*, at p. 300.) This is because "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect. [Citations.] When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." (*Id.* at p. 296.)

In *Perkins*, the defendant had not invoked his right to remain silent or to an attorney before he spoke with the undercover agent. Justice Brennan found this fact significant in his concurring opinion, citing *Edwards* and stating that if the defendant "had invoked either right, the inquiry would focus on whether he subsequently waived the particular right." (*Perkins, supra*, 496 U.S. at p. 300, fn. * (conc. opn. of Brennan, J.).)

C.   *Zapata's Arguments*

Because he invoked his *Miranda* rights prior to speaking with the undercover agents, Zapata argues that *Edwards* rather than *Perkins* applies, and his confession was inadmissible because he never waived his rights after asserting them. However, "California courts have uniformly come to the conclusion that *Perkins* controls when a suspect invokes his *Miranda* right to counsel but later speaks with someone he does not know is an agent of the

10

police." (*Orozco, supra,* 32 Cal.App.5th at p. 815; accord, *People v. Felix* (2024) 100 Cal.App.5th 439, 452 (*Felix*).)

Acknowledging this contrary authority, Zapata advances two arguments. First, he claims that the cases were wrongly decided. Second, Zapata argues that when a known law enforcement officer stimulated conversation between Zapata and the undercover agents, it amounted to a custodial interrogation, taking this case outside the scope of *Perkins*. We agree with Zapata's second argument.[7]

### D. *Zapata's Statements to the Undercover Agents Were Inadmissible*

Not all *Perkins* operations are the same. Some *Perkins* operations use only undercover officers, while others — like that in *Perkins* itself — employ undercover officers and inmates.

Another variation on the *Perkins* operation is the one employed here. In this version, known law enforcement personnel interact with the suspect *during* the conversation with the *Perkins* questioners. The purpose here is two-fold. First, as explained by the deputy in this case, it is to remind the suspect of law enforcement's presence, "it can be as simple as us just walking by and the target of the operation seeing us so they would know we're there." This is meant to increase pressure on the suspect while he or she is talking with the *Perkins* operatives.

Second, interacting with a suspect during the *Perkins* operation allows known officers to apply more overt pressure meant to assist the questioning

---

7    We therefore do not address Zapata's first argument, which is a question pending review in the California Supreme Court. (*People v. Allen* (July 22, 2024, B328333) [nonpub. opn.] review granted Nov. 20, 2024, S286520.) As explained below, our holding is limited to a post-*Miranda* invocation *Perkins* operation where stimulations from a known police officer amount to custodial interrogation.

done by the *Perkins* operatives.  This technique is known as "stimulat[ing]" a conversation.  (*Orozco*, *supra*, 32 Cal.App.5th at p. 809.)  These stimulations, provided by known police officers, are by design intended to increase a suspect's anxiety so the suspect will make incriminating statements to the undercover operatives.  As the deputy in this case explained to the court, "[The line up stratagem] *caused* [*Zapata*] *to want to talk* to, he thought, [ ] other inmates about how to prepare for this."

While the *Perkins* case did not directly address police stimulation techniques, it did speak to such tactics.  "Ploys to mislead a suspect or lull him into a false sense of security *that do not rise to the level of compulsion or coercion to speak* are not within *Miranda*'s concern."  (*Perkins*, *supra*, 496 U.S. at p. 297, italics added.)  Put another way, ploys which rise to the level of compulsion or coercion *remain* within *Miranda*'s ambit.  Indeed, obtaining a confession by "trickery," including false lineups, was among the police tactics criticized in *Miranda*.  (*Miranda, supra*, 384 U.S. at p. 453.)  "It is clear that these techniques of persuasion, no less than express questioning, were thought, in a custodial setting, to amount to interrogation."  (*Innis, supra*, 446 U.S. at p. 299.)

Turning to the facts of this case, the deputy monitored conversation between the cooperating inmates and Zapata during the *Perkins* operation.  Several times the deputy contacted Zapata as stimulations both to remind Zapata law enforcement was there and to get him to talk.  After an hour the cooperating inmates were not getting information about the murder.  At that point, having monitored the jail cell conversation remotely, a known law enforcement agent entered the cell, brought Zapata out, and began the lineup ruse.  The point of this more elaborate ploy was to increase the "level of compulsion" (*Perkins*, *supra*, 496 U.S. at p. 297) on Zapata and to coerce him

12

to speak about the killing, when he got back to his cell. Then, even after Zapata expressly requested an attorney, the deputy increased pressure on Zapata by not only putting him back into the cell, but also simultaneously stating that he would be charged with murder. This prompted the *Perkins* operatives to ask Zapata about that crime.

The way this *Perkins* operation was designed relied on significant participation of a person known by Zapata to be law enforcement while Zapata was in police custody. This situation cannot be fairly characterized as an environment free of a " 'police-dominated atmosphere.' " (*Perkins*, at p. 296.) Law enforcement's recurring presence, along with an elaborate lineup ruse, was intended to place significant pressure on Zapata. More importantly, conducting a fake lineup and announcing the murder charge in the presence of the undercover operatives was "reasonably likely to elicit an incriminating response from" Zapata. (*Innis*, *supra*, 446 U.S. at p. 301.) That was the deputy's stated purpose, and Zapata had no "impartial observers to guard against intimidation or trickery" (*Miranda*, *supra*, 384 U.S. at p. 461) when he subsequently incriminated himself. Accordingly, the deputy's actions raised the *Perkins* operation to a custodial interrogation, implicating Zapata's rights under *Miranda* and *Edwards*.

Further, when Zapata was returned to the *Perkins* operation cell, though he had already invoked his right to counsel prior to any interrogation, no attorney was provided. Consequently, Zapata did not knowingly and intelligently waive his rights. (*Miranda, supra,* 384 U.S. at p. 476 ["any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege"].) Instead, Zapata's subsequent statements about the murder to the police operatives were caused by the known officer's tactics "reasonably

13

likely to elicit an incriminating response from" Zapata. (*Innis*, *supra*, 446 U.S. at p. 301.) The deputy's actions were therefore the type of "further police-initiated custodial interrogation" prohibited under *Edwards*, rendering Zapata's statements inadmissible. (*Edwards*, *supra*, 451 U.S. at pp. 484–485.)

We note that two cases have found admissible a suspect's statements made after invoking the right to counsel and during *Perkins* operations involving police stimulations. In *Orozco*, the police interrupted a conversation between a father suspected of killing his daughter and the child's mother, who was the father's girlfriend. An officer informed the pair that autopsy results showed the daughter had been beaten to death. (*Orozco*, *supra*, 32 Cal.App.5th at pp. 808–809.) Because the father said nothing in response, and did not confess until later when he "resumed his one-on-one conversation with [his girlfriend], completely unaware she was an agent of the police[, h]is subsequent confession to her was accordingly not the product of an interrogation." (*Id.* at p. 816.)[8]

Similarly, in *Felix*, another post invocation stimulation case, a murder suspect was placed in a holding cell with an undercover detective. The suspect initiated conversation about a different crime with the undercover detective. Two other detectives momentarily removed the suspect from the cell and stated they received evidence implicating him in the murder. (*Felix*, *supra*, 100 Cal.App.5th at p. 444.) The suspect "made no incriminating

---

[8] The police also took the girlfriend outside the interrogation room to tell her that the father refused to take a polygraph. Once back inside the room with the father, the girlfriend confronted him about that and shortly afterwards, father confessed. (*Orozco*, *supra*, 32 Cal.App.5th at p. 809.) The court in *Orozco* did not analyze whether this conduct amounted to an interrogation. (*Id.* at p. 816.)

14

statements to [the known detectives]. Rather, like the defendant in *Orozco*, he waited for them to leave and then resumed his voluntary conversation with the undercover detective, believing him to be a fellow inmate. His subsequent incriminating statements were not the result of coercive interrogation." (*Id*. at p. 452.) One could read *Orozco* and *Felix* to suggest that in order for a police stimulation to constitute an interrogation, the stimulating officer must remain present when the suspect incriminates himself. While that is a relevant circumstance, we do not find it controlling because a stimulation's coercive effect will continue to be present even when the officer is not. In this case, the deputy making his presence generally known to Zapata, the lineup ploy, and then the announcement of charges to the undercover inmates, was coercive notwithstanding the fact that it did not come to fruition until after the deputy left the cell. We find the level of activity of the known law enforcement in this case distinguishable from that found in *Orozco* and *Felix*.

In sum, we remain mindful that *Perkins* operations furnish law enforcement, and the community as a whole, a valuable tool to solve crimes. However, police agencies must not violate the important constitutional rights implicated by *Perkins* operations. "[T]he constitutional foundation underlying the privilege [against self-incrimination] is the respect a government—state or federal—must accord to the dignity and integrity of its citizens." (*Miranda, supra*, 384 U.S. 436 at p. 460.) Once exercised, that privilege must "be scrupulously honored." (*Id*. at 479.) "[O]ur accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." (*Id*. at 479.)

Law enforcement exceeded those limitations in this case, making Zapata's statements to the undercover agents inadmissible. We do not reach this conclusion lightly, but to hold otherwise "would 'place a premium on the ingenuity of the police to devise methods of indirect interrogation, rather than to implement the plain mandate of *Miranda*.'" (*Innis, supra,* 446 U.S. at p. 299, fn. 3.)

E.      *The Admission of Zapata's Statements Prejudiced Him*

"The erroneous admission of statements obtained in violation of the Fifth Amendment is reviewed under the *Chapman*[9] standard [citations]. . . . The standard is satisfied only if '[t]here is no reasonable possibility that the verdict would have been more favorable to defendant had [the] statements not been admitted.' [Citation.] Because confessions ' "[a]lmost invariably" will provide persuasive evidence of a defendant's guilt . . . , the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial under the traditional harmless-error standard.' " (*People v. Henderson* (2020) 9 Cal.5th 1013, 1029.)

"[T]he erroneous admission of any given confession 'might be found harmless, for example, (1) when the defendant was apprehended by the police in the course of committing the crime, (2) when there are numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence, or (3) in a case in which the prosecution introduced, in addition to the confession, a videotape of the commission of the crime.' " (*People v. Neal* (2003) 31 Cal.4th 63, 86.)

None of the examples of harmlessness cited in *Neal* are present here. Without Zapata's confession, this case largely turned on the credibility of

---

9      *Chapman v. California* (1967) 386 U.S. 18.

16

R.M., Zapata, and Everett, and the jury partially resolved the conflicting evidence in Zapata's favor by not reaching a verdict on the personal weapon use allegation and by finding Zapata not guilty of first degree murder. Acknowledging that confessions " 'often operate "as a kind of evidentiary bombshell which shatters the defense" ' " (*People v. Roberts* (2017) 13 Cal.App.5th 565, 577), we cannot say the erroneous admission of Zapata's statements from the *Perkins* operation was harmless beyond a reasonable doubt.  Accordingly, reversal is required.

## IV. DISPOSITION

The judgment is reversed and remanded to the trial court for further action not inconsistent with this opinion.


RUBIN, J.

WE CONCUR:


MCCONNELL, P. J.


DATO, J.

17