Filed 5/7/26  P. v. Foster CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B337548 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA159188) |
| v. | |
| EMMANUEL MIRRIEN FOSTER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Connie R. Quinones, Judge.  Affirmed in part, reversed in part and remanded with directions.

Judith Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven E. Mercer and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

A jury found defendant and appellant Emmanuel Mirrien Foster guilty of one count of first degree murder, and found true the allegation he personally used a firearm in the commission of the murder. The jury also found defendant guilty of one count of shooting at an inhabited dwelling. Defendant received a sentence of 35 years to life plus 1 year 8 months.

Defendant challenges his conviction, arguing the trial court committed prejudicial error in admitting his pretrial statements to an undercover informant during what is commonly referred to as a *Perkins* operation. (*Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).) Defendant contends the court also erred in admitting pretrial statements made by codefendant Willie Jones in a separate *Perkins* operation. Finally, defendant says that if we do not reverse his convictions due to the admission of the pretrial statements, then we should remand for resentencing due to several sentencing errors.

As we explain below, we conclude remand for a full resentencing hearing is warranted. We otherwise affirm the judgment of conviction in its entirety.

### FACTUAL AND PROCEDURAL SUMMARY

On October 30, 2022, Robert Walton was fatally shot on South Clymar Avenue in Compton. Defendant and codefendant Jones were arrested and charged with one count of murder (Pen. Code, § 187, subd. (a);[1] count 1). Defendant was also charged with one count of shooting at an inhabited dwelling (§ 246; count 2). As to count 1, defendant was alleged to have personally used a firearm in the commission of the murder within the meaning of section 12022.5, subdivision (a). The People also alleged multiple

---

[1] All undesignated statutory references are to the Penal Code.

aggravating factors. (Cal. Rules of Court, 4.421(a)(1)–(a)(3) & (b)(1).) Jones is not a party to this appeal. Evidence at the joint jury trial established the following facts material to our discussion.

**1. Testimony of the victim's girlfriend I.H.**

In October 2022, I.H. had been dating Walton for about three years. Walton's nickname was Nuskii, and he drove a white Mercedes-Benz. I.H. also knew defendant and codefendant Jones. Defendant, who went by the moniker Active, had once lived in the same apartment complex as I.H. As for Jones, I.H. had known him and most of his family since she was a child. Jones was often called Nu-Nu or Tiny Hands. Jones's brother Lorenzo had been killed sometime in 2020. I.H. knew Jones had a motorcycle and had seen him riding it numerous times in the neighborhood, including on the afternoon of October 30, 2022.

I.H. knew the Fruit Town gang was active in her neighborhood. She said some of her family members were involved with the gang, but she denied any gang affiliation.

On October 30, 2022, Halloween festivities were held at Gonzales Park in Compton. Around 1:00 that afternoon, I.H. went to Gonzales Park with her friend S.T. (who was dating defendant), Yolanda K. (I.H's half sister), and Nikendra C. (a friend of Yolanda's). Nikendra drove them. Over the course of the afternoon, they left briefly to go to a nearby marijuana shop and to pick up some takeout food. I.H. admitted to smoking weed that afternoon. She said defendant and Jones were also at the park. I.H. recalled that defendant was wearing a red jacket, and Jones a black hoodie.

I.H. had been texting with Walton throughout the day, mostly arguing. Sometime around 6:00 p.m., the four women left the park and returned to the marijuana shop in Nikendra's car. Walton drove up in his Mercedes. I.H. got out of the car to go see Walton, but he yelled at her from his window and threw a drink at her. I.H.

3

threw her phone at his car as he drove off.  The other women urged I.H. to get back in the car with them.  She did briefly, but then asked to be let out of the car.  She walked to Walton's house to see if he had gone home, but his car was not there.  As she was walking along Clymar Avenue, she called Walton, and he drove up.  They continued to argue.  Their argument escalated to a point where Walton drove towards I.H. as if to hit her, and I.H. threw rocks at the car.

While they were still arguing, Yolanda, Nikendra and S.T. arrived.  Yolanda told I.H. to get back in the car with them, but I.H. told them to leave.  I.H. tried to get into Walton's car, but he pulled away before she could close the door and she fell to the ground.  Shortly thereafter, I.H. heard six to seven gunshots, "spaced out."  She ran to Nikendra's car and got in.  After they drove a short distance, I.H. said she was worried about Walton and wanted to go back.  Nikendra refused, and I.H. demanded to be let out.  S.T. got out with her, and I.H. ran back to Clymar Avenue.

I.H. saw a black motorcycle with a big front headlight and two people on it, driving down Clymar Avenue.  She recognized the motorcycle as Jones's bike.  She could not see the faces of the people on the motorcycle.  But I.H. believed the back passenger was defendant based on his size and the thick hair sticking out of his hoodie.  The driver was wearing a black jacket and black beanie.

When I.H. finally got to the end of Clymar Avenue, she saw Walton's car had crashed into a light pole.  Walton was not inside the car.  Shortly thereafter, S.T. arrived.  She called 911 and stayed with I.H. until the police arrived.

I.H. spoke with the police several times about what happened.  She said she was scared and did not want someone to "do something" to her for talking, so she initially did not say much.

4

But she later told the detectives what she saw that day, including that Jones had been at the park on his motorcycle.

## 2.    Other evidence

S.T. testified that she knew Jones rode a motorcycle and even had a video on her cell phone of Jones on the bike.  She admitted hearing gunshots ring out on Clymar Avenue and she heard a motorcycle, but she did not see any motorcycle and could not identify the shooter.  S.T. said she felt pressured by the detectives to "say[ ] something" and that is why she told them that defendant had killed Walton, even though that was wrong and she had not seen what happened.  She denied being in a dating relationship with defendant.

Two residents on South Clymer Avenue also testified.  D.B. had lived on South Clymer Avenue for many years, and was at home with her sister on October 30, 2022.  She recalled hearing a lot of screaming, a loud crash, and "some popping" noises which she and her sister believed to be gunshots or firecrackers.  They got down and stayed away from the windows.  Afterward, a bullet hole was found in the wall of her front porch near the garage.

S.A. testified he was with his children in his car outside his home, getting ready to leave when he saw a young woman on the street yelling and arguing with a man in a white car.  They got fairly loud and animated, so S.A. was waiting for them to leave before he drove off.  He then heard gunshots and initially thought the man in the white car had shot at the woman because she started running.  At that point, he saw the headlight of a motorcycle heading in the same direction as the car.  The car eventually crashed and S.A. heard some additional gunshots.  S.A. gave the video footage from the security cameras on his house to the police.

When officers arrived on the scene, they found a white Mercedes-Benz crashed into a light pole near the intersection of

South Clymar Avenue and 145th Street. There was no one inside the car. Walton's body was eventually located near a residence farther up the street. It was later determined that Walton died from multiple gunshot wounds, including to the right neck, right chest, and left arm.

Several expended shell casings and live rounds were recovered at the scene and tested for DNA. Defendant was determined to be a contributor to the DNA found on one of the casings, along with two other unknown contributors. All of the fired shell casings and live rounds were the same caliber: 5.7 by 28 millimeters. The most common manufacturers of firearms that used that size ammunition were FN and Ruger. All of the live rounds recovered at the scene had blue tips.

Video footage from several security cameras recovered during the investigation captured some of the events on Clymar Avenue that evening, including the argument between I.H. and Walton. Another video showed the arrival of a dark motorcycle with two riders. The footage recovered did not show the shooting or the car crash, but some footage captured an individual running across the front yard of a home and eventually jumping onto the back of the motorcycle, which then sped from the scene. One video that also contained audio captured Walton leaning out of the window of his car and yelling toward I.H. and the other women, "Fuck y'all dead homies." That video also captured a motorcycle with two passengers accelerating at a high rate of speed down Clymar Avenue, the sound of screeching tires followed by gunshots and the sound of a car crashing.

Mapping of cell phone data showed that both defendant's and Jones's cell phones were using cell towers in the vicinity of the murder scene during the timeframe when the shooting occurred.

6

Detective Robert McGaughey of the Los Angeles County Sheriff's Department, one of the lead detectives in the case, testified that during her second interview, I.H. identified Jones as the driver of the motorcycle and defendant as the passenger. Additional testimony confirmed that Jones's brother Lorenzo was fatally shot in December 2020.

**3.     *Perkins* statements by defendant and Jones**

Detective McGaughey testified about the pretrial statements obtained from defendant and Jones.

Detective McGaughey explained that after defendant was detained in December 2022, he was placed in a cell with an informant "posing as an inmate" during the *Perkins* operation. The informant was instructed to converse with defendant about the shooting. The cell in which the operation took place had a recording device, and the informant was also equipped with an undercover recording device to capture any conversations with defendant. The recordings of those conversations were played for the jury.

A month later, a similar operation was conducted with Jones and his statements were also introduced into evidence.

We reserve a more detailed discussion of the statements and admissions made by defendant and Jones to parts 1 and 2 of the Discussion below.

**4.     Verdict and sentencing**

The jury found defendant guilty as charged. Defendant waived his right to a jury trial on the aggravating factors. The court found all aggravating factors true, except for the allegation the victim was particularly vulnerable.

The court sentenced defendant to 35 years to life plus 1 year 8 months, calculated as follows: a term of 25 years to life on count 1; plus a consecutive 10-year upper term for the firearm enhancement; plus a consecutive term of one year eight months

(one-third the midterm) on count 2. The court awarded defendant 547 total days of presentence custody credits (476 actual & 71 conduct).

This appeal followed.

## DISCUSSION

### 1. Admission of defendant's *Perkins* statements

Defendant contends the trial court committed prejudicial error in admitting his statements to the undercover informant during the *Perkins* operation. We are not persuaded.

#### 1.1 Background

After his detention, defendant was placed in a holding cell with an undercover informant posing as an inmate and a member of the Brim gang. We will refer to the informant as the *Perkins* agent.

Defendant casually spoke with the *Perkins* agent for a period of time and then Detective McGaughey stopped by to tell defendant that his partner was running late, but that once he arrived they would be talking to him about the murder of Nuskii that had taken place before Halloween. The detective told defendant he had already spoken to I.H., S.T., Yolanda, Nikendra and Jones.

Once Detective McGaughey left, the *Perkins* agent and defendant resumed talking. There were periods of silence and lots of unintelligible comments not clearly picked up by the recording device.

The *Perkins* agent told defendant, "It sounds like somebody telling." Defendant said he felt like he was going to be sick. Defendant said, "He's gonna ask where was I at that night, all that type of shit." The *Perkins* agent asked defendant if he had any "shit at your house that puts you there" like a "Strap and all that?" Defendant responded, "Nothing. None of that." When asked if any license plates could place him at the scene, defendant said, "I wasn't driving."

The *Perkins* agent repeated at several different points in the conversation that it sounded like someone must be snitching or talking. At one point, defendant told the *Perkins* agent, "[T]hat's what I'm telling you. I shut that nigga up." The comments directly preceding that statement are largely unintelligible.

Defendant was then removed from the cell for an interview with the detectives. When he returned, defendant told the *Perkins* agent the detectives were saying his girlfriend was talking, they had surveillance video, and he would not be seeing the light of day again. Defendant then added that the detectives "got nothing."

The *Perkins* agent told defendant he hoped defendant got rid of the "whip." Defendant responded by saying the other guy got rid of it, that it was not even his "shit," and referenced being on a motorcycle. When asked if the motorcycle had been dealt with, defendant said the detectives told him the motorcycle was at Jones's "baby mama's house." At some point, defendant asked the *Perkins* agent if he knew of a firearm called an "FN," and ammunition called "five seven" with blue tips.

Defendant said the detectives were talking like they had a bunch of evidence, but they "didn't show me nothing." He said he told the detectives he smoked a lot of weed that day and did not remember anything.

There is another section of largely unintelligible comments, followed by defendant telling the *Perkins* agent that "this nigga, he said 'fuck the dead homies.' … [H]e go and say, 'Fuck the dead homies' … because he got into it with his bitch … I'm tired of that shit, bro."

The *Perkins* agent asked if the victim died at the scene and defendant said, "hell yeah." A detective returned to the cell and showed defendant a photograph. After the detective left, the

9

*Perkins* agent asked defendant about the photograph and defendant said "that's the nigga that was driving when we hit Nuski[i]."

### 1.2    Forfeiture

The People urge us to find defendant forfeited his argument by failing to specifically raise an objection based on *Miranda v. Arizona* (1966) 384 U.S. 436 or *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*) in the trial court.  We decline to do so.

The parties presented and argued pretrial motions on the admissibility of the pretrial statements made by both defendant and Jones.  In explaining its ruling on the motions, the trial court referenced the relevance of *Perkins* and California law following *Perkins*.  Among other things, the court noted both men believed they were talking to fellow inmates and concluded the statements did not violate *Miranda*.  Moreover, at the time of defendant's trial in December 2023 and January 2024, our Supreme Court had declined to review the issue of if and how an undercover *Perkins* operation is affected by a suspect's prior invocation of *Miranda* rights.  (See, e.g., *People v. Valencia*, review den. Dec. 11, 2019, S25803).)  After defendant's trial and while this appeal was pending, the Supreme Court granted review in *People v. Allen*, review granted November 20, 2024, S286520.  The issue remains under consideration.

We therefore decline to find forfeiture and will resolve the merits of defendant's claim.  (*People v. Perez* (2020) 9 Cal.5th 1, 14 ["Asking attorneys at the trial level to predict that our court might in the future overrule its prior precedent—or risk forfeiting constitutional claims of their clients—simply requires too much"]; *People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 ["Because the question whether defendants have preserved their right to raise this issue on appeal is close and difficult, we assume [they] have preserved their right, and proceed to the merits"].)

10

### 1.3  Analysis

*Perkins* explains that "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner.  As we recognized in *Miranda,* 'confessions remain a proper element in law enforcement.  Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.' [Citation.]  Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." (*Perkins, supra,* 496 U.S. at p. 297.)

Defendant acknowledges the holding in *Perkins*, as well as California law that has followed *Perkins*, including this court's decision in *People v. Felix* (2024) 100 Cal.App.5th 439, 451 (*Felix*). (See also *People v. Orozco* (2019) 32 Cal.App.5th 802, 813–815.)  But defendant nonetheless urges us to reconsider *Felix* and, instead, to follow the dissent in *Felix*.

The dissent in *Felix*, which hinged its analysis on *Edwards*, is of no assistance to defendant.  *Edwards* held that "*when an accused has invoked his right to have counsel present during custodial interrogation*, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." (*Edwards, supra*, 451 U.S. at p. 484, italics added.)  Because there was no dispute in *Felix* that the defendant invoked his right to counsel during his initial police interrogation, the dissent in *Felix* concluded that *Edwards* controlled, and a valid waiver of that asserted right was required before any further questioning could occur, even under the guise of a *Perkins* operation.  (*Felix, supra*, 100 Cal.App.5th at pp. 453–454 (dis. opn. of Stratton, P. J.).)

11

Here, the record contains no evidence that defendant invoked his right to counsel during his interview with the detectives or at any other time. The detective testified to reading defendant his *Miranda* rights, getting his background information, and talking generally about the night of the shooting and then returning defendant to the holding cell. But there is no testimony or other evidence demonstrating that defendant invoked his right to counsel before returning to the cell and resuming his conversation with the *Perkins* agent.

Defendant's own statements to the *Perkins* agent once he returned to the cell appear to indicate he did not decline to talk with the detectives or assert any right to counsel, but rather, that he did not say much to the detectives, telling them that he did not remember anything because he had smoked a lot of weed that day.

Recently, *People v. Zapata* (2026) 118 Cal.App.5th 529, like the dissent in *Felix*, concluded that *Edwards* controlled the analysis. But there, like *Felix*, the defendant also clearly invoked his right to counsel. (*Zapata*, at p. 534.) *Zapata* therefore does not provide any basis for finding the trial court erred in admitting defendant's statements to the *Perkins* agent. Defendant states no other bases for disregarding *Perkins* and its progeny on our facts.

Accordingly, we conclude defendant's uncoerced statements to the *Perkins* agent were properly admitted.

## 2. Admission of codefendant Jones's statements

Defendant contends the trial court prejudicially erred in admitting pretrial statements made by Jones, over defense objection, because they were not statements against his penal interest and therefore inadmissible hearsay. We conclude any error in admitting Jones's statement was harmless.

12

### 2.1  Background

The detectives conducted a separate *Perkins* operation with Jones using an undercover informant posing as an inmate and wearing a recording device.  As we did above, we will refer to the undercover informant as the *Perkins* agent.

When he first started talking to the *Perkins* agent, Jones identified himself as a member of the Fruit Town gang.  Throughout his conversation with the *Perkins* agent, Jones repeatedly denied any involvement in any shooting, and asserted that others must be snitching and lying.  Jones said he did not know Nuskii from the Bounty Hunters.  He said the night Nuskii was killed, he was at a nightclub in downtown.

Later in the conversation, Jones told the *Perkins* agent that the detective had been "just throwing some shit."  He said the detective asked him, " 'What's up with Active? … You all know what's up … He in jail.' "  The *Perkins* agent then asked Jones whether he thought defendant "might be saying something?"  Jones said he did not know, but that defendant "can't say nothing unless he just rat his self out with this to try to get me to do time with him."  Jones continued, saying "And he's the one that did it.  I ain't did shit."  Jones insisted he did not drive defendant anywhere and did not pull the trigger.  "I was no driver."

Jones was subsequently interviewed by detectives and read his *Miranda* rights.  Jones talked with the detectives without requesting counsel.  Jones acknowledged that his brother Lorenzo had been killed by members of the Bounty Hunter gang a few years earlier, and that I.H. was dating someone from that gang.  Jones otherwise continued to deny any involvement.  When the detectives said they knew he was not the shooter, he said he also was not the driver.  One of the detectives said maybe Active shot Walton for "disrespecting a homey."  Jones said, "[t]hat's on him."  Jones said

his bike may have been used, but he was not there and did not do anything.

### 2.2    Analysis

Statements against penal interest are a well-settled exception to the hearsay rule and may be properly admitted under Evidence Code section 1230.  But the exception "does not apply ' "to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." ' " (*People v. Jasso* (2025) 17 Cal.5th 646, 669.)  The statements by Jones at issue here are overwhelmingly self-serving.

Assuming it was error to admit his statements, we nevertheless conclude that error was harmless.  Error in this context is assessed under the state law standard set forth in *People v. Watson* (1956) 46 Cal. 2d 818, 836–837.  (*People v. Duarte* (2000) 24 Cal.4th 603, 618–619.)  The error is harmless unless we conclude it is reasonably probable the error affected the verdict.  (*Watson*, at pp. 836–837.)

Defendant's statements to the *Perkins* agent were powerful admissions of guilt.  Defendant made many statements that were corroborated by other evidence, including the type of firearm and ammunition used.  Perhaps most damningly, he told the *Perkins* agent, who asked about the photograph the detective brought to the cell, that the photo was a picture of Jones who "was driving when we hit Nuski[i]."  I.H., who knew both defendant and Jones, told the detectives they were the two on the motorcycle that night.  Combined with the eyewitness testimony as to how the shooting occurred, aspects of which were corroborated by video footage, the DNA evidence linking defendant to one of the shell casings, and the cell phone data evidence, we are convinced the admission of Jones's statements was harmless.  Jones's statements, oftentimes difficult to follow, and focused almost exclusively on denials of his own

14

involvement and making very little understandable references to defendant, would not reasonably have carried significant weight in comparison to the balance of the evidence received at trial, and defendant's own admissions of complicity. It is not reasonably probable defendant would have obtained a more favorable verdict had Jones's statements been excluded.

## 3. Sentencing issues

Defendant contends the trial court committed sentencing error by failing to stay the sentence imposed on either count 1 or count 2. He argues that both counts were committed during one indivisible course of conduct, and therefore section 654 required the court to impose a stay on one of the counts. We disagree.

It is well-settled "there is a 'multiple victim' exception to section 654. Under this exception, 'even though a defendant entertains but a single principal objective during an indivisible course of conduct, he may be convicted and punished for each crime of violence committed against a different victim.' " (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781; accord, *People v. Andrews* (1989) 49 Cal. 3d 200, 225.) There was substantial evidence in the record that counts 1 and 2 pertained to two separate victims. Count 2 was premised on shooting at an occupied dwelling. Walton, the murder victim, was not the focus of count 2. The evidence established that in firing multiple shots, at least one struck the home of D.B. while she was inside with her sister. They heard the gunshots, the sound of Walton's car crashing, and got away from the front windows to avoid being struck.

The People argue the court did err however in imposing a one-third the midterm sentence on count 2, improperly treating count 2 as a subordinate term to count 1. The People argue remand for resentencing is warranted. In his reply brief, defendant agrees that

15

remand for resentencing is appropriate in the event we do not reverse his convictions.

We agree with the parties that remand for resentencing is warranted. Indeterminate and determinate sentences are governed by different statutes. (See, e.g., §§ 669, 1170.) The trial court here imposed an indeterminate sentence of 25 years to life on count 1. The court had the discretion to impose a consecutive determinate term on count 2, but count 2 was *not* a subordinate consecutive term subject to reduction under section 1170.1.

Section 1170.1 requires reduction of consecutive terms to one-third " 'only when all terms of imprisonment are "determinate," i.e., of specified duration. A life sentence is "indeterminate," i.e., not for a fixed period. When a defendant is sentenced to both a determinate and an indeterminate sentence, the determinate sentence is served first. Nonetheless, neither term is "principal" [n]or "subordinate." *They are to be considered and calculated independently of one another.' "* (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1094.)

Accordingly, this case must be remanded for resentencing to allow the trial court the opportunity to exercise its discretion in choosing an appropriate sentence for defendant's conviction on count 2. (§ 246 [specifying penalty for shooting at an occupied dwelling as "imprisonment in the state prison for three, five, or seven years, or by imprisonment in the county jail for a term of not less than six months and not exceeding one year"].) In so doing, the court shall conduct a full resentencing hearing at which it may reconsider all of its sentencing choices anew.

Because we conclude it is appropriate to remand for a full resentencing, we do not reach defendant's other claims of sentencing error.

16

## DISPOSITION

The sentence on count 2 is reversed and the case remanded to the superior court for a full resentencing hearing. We affirm the judgment of conviction in all other respects.

VIRAMONTES, J.

WE CONCUR:

STRATTON, P. J.

SCHERB, J.